GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

ABBIE BROUGHTON MARSH
California State Bar No. 226680
ALANNA KENNEDY
Arizona State Bar No. 034257
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: Alanna.Kennedy@usdoj.gov
Email: Abbie.BroughtonMarsh@usdoj.gov
Telephone: 602-514-7500
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-19-01224-PHX-DJH |
| Plaintiff, | |
| v. | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT** |
| Martin Gutierrez-Barba, | |
| Defendant. | |

The government hereby responds to defendant Martin Gutierrez-Barba's Motion to Dismiss the Superseding Indictment (ECF No. 74), and respectfully requests that the Court deny his motion. Gutierrez-Barba is not charged with any law enacted in the 1920's; he is charged with violating 8 U.S.C. § 1326, Reentry of Removed Aliens, effective September 30, 1996. Moreover, his equal protection claim fails because Congress's plenary power over immigration affairs is subject to a highly deferential standard of review. The illegal reentry law, which seeks to deter illegal immigration, easily passes muster. Accordingly, Gutierrez-Barba's motion should be denied.

## I.   BACKGROUND

Gutierrez-Barba is a citizen of Mexico. He was charged by Complaint for violating Title 8 U.S.C. § 1326(a), Reentry of a Removed Alien on September 30, 2019. (ECF No.

1). A superseding indictment was ultimately filed on November 19, 2019, alleging that Gutierrez-Barba was "deported, and removed from the United State at or near Nogales, Arizona on or about December 18, 2009[.]" (ECF No. 18.) After arraignment on the superseding indictment, Gutierrez-Barba was released on his own recognizance (ECF No. 24.) He has a current trial date of June 1, 2021. (ECF Nos. 67, 70.) Gutierrez-Barba filed the instant motion, his second motion to dismiss, on May 5, 2021. (ECF No. 74.)

## II. ARGUMENT

Gutierrez-Barba's equal protection claim should be rejected because immigration laws passed by Congress are subject to a highly deferential standard of review, and under that standard, 8 U.S.C. § 1326(a), which serves a legitimate government purpose, is facially legitimate and bona fide.

### A. Immigration Laws are Subject to Rational Basis Review

For more than a century, "it has been universally recognized that Congress possesses authority over immigration policy as an incident of sovereignty." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998). The Supreme Court called Congress's inherent immigration power "plenary"; the Ninth Circuit deemed it "sweeping." *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) and *Catholic Social Servs. v. Reno*, 134 F.3d 921, 927 (9th Cir. 1998)). "Whatever the label, all agree that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976). Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (citing *Mathews v. Diaz*, 426 U.S. 67, 82 (1976)); *see also id.* at 792 ("[I]t is important to underscore the limited scope of judicial

2

inquiry into immigration legislation."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("deferential standard of review" applies in immigration context).

This "deferential standard of review" is limited to considering whether the law is "facially legitimate and bona fide," *Mandel*, 408 U.S. at 769, and it applies equally to congressional decision-making, *Fiallo*, 430 U.S. at 795. *See id.* at 799 (rejecting equal protection challenge to congressional law giving immigration preferences to mothers of illegitimate children because the issue was "solely for the responsibility of the Congress and wholly outside the power of this Court to control"). In the Ninth Circuit, *Mandel*/*Fiallo*'s "facially legitimate and bona fide" test is "equivalent to the rational basis test typically applied in equal protection cases." *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir. 1995) (applying rational-basis review and finding the Government "put forth facially bona fide and legitimate reasons" for requiring proof of paternity within a certain time limitation); *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (stating that in immigration affairs, outside of citizenship claims, "[w]e have applied *Fiallo*'s standard and looked for only a 'facially legitimate and bona fide reason' to support a statutory distinction"); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard . . . ."); *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (for equal protection claims, "ordinary rational basis review is the appropriate standard in the immigration context").[1]

The rational-basis test is an "exceedingly low level of judicial scrutiny." *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000). The test is met where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). "[T]he government 'has no obligation to produce evidence to sustain the rationality of a statutory classification'; '[t]he burden is

---

[1] In a concurring opinion in *Ledezma-Cosino*, three judges presented their view, citing *Mandel*/*Fiallo*, that the government's burden in the immigration context is "even lighter than rational basis: We approve immigration laws that are facially legitimate without probing or testing possible justifications." *Ledezma-Cosino*, 857 F.3d at 1050 (Kozinski, J., concurring).

3

on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Glickman*, 217 F.3d at 1201 (quoting *Heller*, 509 U.S. at 320). Indeed, "[t]he rational basis standard . . . does not require that the [governmental entity] choose the best means of advancing its goals." *Vermouth v. Corrothers*, 827 F.2d 599, 603 (9th Cir. 1987). Instead, all that is needed is some "rational connection" between the rule and the governmental interest, regardless of whether that rule is an "exact fit" for the interest at issue. *Mauro v. Arpaio*, 188 F.3d 1054, 1059–60 (9th Cir. 1999). Moreover, rational-basis review allows for decisions "based on rational speculation unsupported by evidence or empirical data." *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015).

The government has a legitimate interest in deterring illegal reentry. And there is a clear rational relationship between that interest and Section 1326, which criminalizes—and thereby deters—illegal reentry. *See, e.g.*, *Hernandez-Guerrero*, 147 F.3d at 1078 ("In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."). Indeed, because Section 1326's "clear purpose is to deter aliens who have been forced to leave the United States from reentering the United States, § 1326 is well within the ambit of Congress's sweeping power over immigration matters." *Id.* (citations and formatting omitted).

As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. "On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Id.* (*citing Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973)). That is clearly not the case here with Section 1326, which seeks to deter all aliens from illegally entering the United States, particularly after they have already been subjected to an order of removal. *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular

groups within a class are ordinarily of no constitutional concern."). Section 1326 easily passes the rational basis test and does not violate the equal protection clause.[2]

### 1. *The higher percentage of illegal reentry prosecutions of Mexican and Latinx defendants is a product of geography, not discrimination*

Higher percentages of Mexican and other Latinx defendants prosecuted for 8 U.S.C. § 1326 violations are because of Mexico's—and other Latin American countries'—proximity to the southern border. While Gutierrez-Barba cites the higher percentage of arrests of Mexican and Latinx defendants as proof of disparate impact and discrimination, it is not. Those numbers are a product of geography. For instance, in FY20, Border Patrol encountered 405,036 total encounters, and to date in FY21, Border Patrol has encountered 726,401 individuals. *See* U.S. Customs & Border Prot., CBP Enforcement Statistics Fiscal Year 2021, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. In FY 2020, 99% of these encounters (400,651) occurred on the southwest border. *See* U.S. Customs & Border Prot., Southwest Border Migration FY 2020, https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2020. These numbers are consistent with the U.S. Sentencing Commission's most recent data on prosecutions for illegal reentry statistics from FY19. *See* U.S. Sent. Comm'm, Quick Facts: Illegal Reentry Offenses, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf. In sum, these numbers are neither surprising nor illuminating of Congress's motives in the 1920's.[3]

---

[2] In any event, given Congress' plenary authority over immigration, § 1326 would satisfy strict scrutiny. "To satisfy strict scrutiny, the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest. *Miller v. Johnson*, 515 U.S. 900, 920 (1995). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Cortez-Rocha*, 394 F.3d 1115, 1123 (9th Cir. 2005) (citing *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons . . . is at its zenith at the international border."). Section 1326, applicable to any alien who unlawfully enters the United States after a prior removal, achieves that interest in the most possible tailored way.

[3] Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity—to include those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (plurality opinion) (finding that the disparate impact of DACA rescission on Latinos from Mexico—totaling 78% of DACA

*2.* Arlington Heights *and* Espinoza *are inapplicable*

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977), is inapplicable to Gutierrez-Barba's case.[4] Indeed, Gutierrez-Barba fails to cite any case finding the rubric of *Arlington Heights* applicable to immigration laws passed by Congress. For good reason: the expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267-68. This does not comport with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking.

Separately, Gutierrez-Barba cannot escape the reality that the "governing statutory framework" of United States' immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA. *See* Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1 et seq.); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018). Nor can he escape the fact that 8 U.S.C. § 1326 has been updated or modified several additional times by Congress since the 1920s.[5] Gutierrez-Barba's motion waves away this lengthy congressional record, claiming "later

---

recipients—did not establish a plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds") (citation omitted).

[4] *Arlington Heights* involved a rezoning request to accommodate the placement of low-income housing, "which would probably be racially integrated." *Id.* at 258. In other words, it is far from the circumstance here involving the plenary power of Congress over immigration affairs.

[5] Even assuming Gutierrez-Barba is correct that 8 U.S.C. § 1326 has an "uncomfortable past," that is not the version of the statute he was charged with for the instant offense. Section 1326 has had several modifications since its enactment, the most recent of which occurred September 30, 1996, with the passage of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, Div. C, Title III, § 306(a)(2), 110 Stat. 3009-607 (1996).

6

reenactments do not cleanse the law of its original taint." (ECF No. 74 at 15.)

Under Gutierrez-Barba's view, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry. This makes little sense. Even assuming intentional discrimination existed in 1920s legislation, this is a question about the motives of the legislature at that time. Legislative intent is not an artifact that "carr[ies] over" from one law to the next; it must be decided anew with each successive enactment. *See, e.g.*, *Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) (inquiring "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot . . . condemn governmental action that is not itself unlawful"); *cf. Palmer v. Thompson*, 403 U.S. 217, 225 (1971) (contemplating that a law invalidated because of improper motive might "be valid" if the legislature "repassed it for different reasons").

The cases Gutierrez-Barba relies on for his "forever tainted" argument do not support it. In *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the Supreme Court held that the Sixth Amendment, as incorporated against the states, requires that a jury find a criminal defendant guilty by a unanimous verdict. That result flowed simply from a historical and textual analysis of the Sixth Amendment, e.g., that a "trial by an impartial jury" "unmistakabl[y]" required a jury to "reach a unanimous verdict in order to convict." *Id.* at 1395. The Court did not hold that the origins of the state laws at issue were the basis for invalidating those state laws. On the contrary, the majority, even while commenting on the racist origins, explicitly stated that "the dissent is right about one thing—a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment." *Id.* at 1401 n.44; *see id.* at 1426 (Alito, J., dissenting) ("If Louisiana and Oregon originally adopted their laws allowing non-unanimous verdicts for these reasons, that is deplorable, but what does that have to do with the broad constitutional question before us? The answer is: nothing."). Gutierrez-Barba's characterization of *Ramos* is that the Court's discussion of the racial underpinnings of the state law drove the outcome. Instead, as the majority acknowledged, it was entirely superfluous. In any event, *Ramos*

has no applicability here because it does not involve immigration law and the concomitant deferential standard of review.

Likewise, *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), is similarly irrelevant. There, the Supreme Court considered whether application of a "no-aid" provision in Montana's constitution to bar religious schools from participating in a state scholarship program violated the Free Exercise Clause of the First Amendment. *Id.* at 2254. The answer was yes, because the provision "plainly exclude[d] schools from government aid solely because of religious status." *Id.* at 2255. The provision was not found unconstitutional because of any "checkered tradition," as Gutierrez-Barba suggests. (ECF No. 74 at 15.) That phrase appears briefly in the opinion in response to the argument that a tradition arose in the second half of the 19th century against state support for religious schools. *Espinoza*, 140 S. Ct. at 2258. The Court rejected that movement as illuminating the historical understanding of the Free Exercise Clause. *Id.* at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause."). In sum, neither *Ramos* nor *Espinoza* stands for the proposition Gutierrez-Barba claims—that "not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint." (ECF No. 74 at 15.)

As a final example of Gutierrez-Barba's erroneous original taint argument, several courts of appeals have recognized that, when a State reenacts a particular voting provision that was intentionally discriminatory when first enacted, the ultimate focus in any subsequent litigation must be the intent of the reenacting legislature, not the original one. *See Hayden v. Patterson*, 594 F.3d 150, 166-167 (2d Cir. 2010) (addressing felon-disenfranchisement law); *Johnson v. Governor*, 405 F.3d 1214, 1223-1224 (11th Cir. 2005) (en banc) (same); *Cotton v. Fordice*, 157 F.3d 388, 391-392 & n.7 (5th Cir. 1998) (same); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim). Those courts also have rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made.

*Johnson*, 405 F.3d at 1223; *see Hayden*, 594 F.3d at 166-167; *accord Cotton*, 157 F.3d at 392 (reaffirming that plaintiff was required to show that the "*current* version" of the law was "adopted out of a desire to discriminate") (emphasis added).

### 3. Even assuming *Arlington Heights* and *Espinoza* are applicable, Gutierrez-Barba cannot show disparate impact

In any event, even assuming Gutierrez-Barba's "forever tainted" position is permissible, and even assuming the Court may examine the constitutionality of legislation that does not contain the crime he is charged with, and even assuming *Arlington Heights* applies to probe the justifications of Congress's immigration actions, his claim still fails.

To begin, Gutierrez-Barba does not show a disparate impact. As outlined above, the statistics he cites for disparate impact are a feature of Mexico's proximity to the United States, not discrimination. This alone is sufficient to reject his *Arlington Heights* analysis. *See, e.g.*, ECF No. 74 at 15-16 (admitting that *Arlington Heights* requires Gutierrez-Barba to establish that a law "disparately impacts a particular group"); *Regents of the Univ. of California*, 140 S. Ct. at 1915-16 ("because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds").

Moreover, Gutierrez-Barba's perspective that the 1920's immigration laws were premised on racial animus towards Mexicans is considerably undercut by the fact that people born "in the republic of Mexico" were not subject to the quotas established by the Immigration Act of 1924. On the contrary, an immigrant born in "the Republic of Mexico" was defined as a non-quota immigrant on par with those born in Canada and several other places. *See* Pub. L. No. 68-139, § 4, 43 Stat. 155. For some—Asia, for instance—the quota system completely excluded immigration. *See* U.S. Dep't of State, Office of the Historian, The Immigration Act of 1924 (The Johnson-Reed Act), https://history.state.gov/milestones/1921-1936/immigration-act. These facts do not

comport with Gutierrez-Barba's view that Congress was developing legislation with the intent and purpose of discriminating against persons from Mexico.

Relatedly, "no [Supreme Court] case . . . has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Indeed, the Supreme Court, in *United States v. O'Brien*, 391 U.S. 367, 383 (1968), cautioned of "the hazards of declaring a law unconstitutional because of the motivations of its sponsors. First, it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment," *Palmer*, 403 U.S. at 224 (citing *O'Brien*, 391 U.S. at 383, 384), "that is [otherwise], under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it," *O'Brien*, 391 U.S. at 384. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [courts] to eschew guesswork." *Id.*

At the conclusion of the *Arlington Heights* analysis, Gutierrez-Barba claims the government would have to show that the contested law would have passed "even had the impermissible purpose not been considered." (ECF No. 74 at 17 (citing *Arlington Heights*).) There is no need to reach this point. And in any event, Congress *did* pass a new illegal reentry law in 1996, and Gutierrez-Barba does not suggest any discriminatory purpose with that legislation.

    4. *Courts within the Ninth Circuit have repeatedly upheld the constitutionality of 8 U.S.C. § 1326 and similarly implicated criminal immigration provisions in a variety of contexts, including the basis on which Gutierrez-Barba relies now*

Gutierrez-Barba's precise argument has been consistently struck down in several courts within the Ninth Circuit. In *United States v. Lucas-Hernandez*, the court denied a defendant's virtually identical argument made in the 8 U.S.C. § 1325 illegal entry context. No. 19-MJ-24522-LL, 2020 WL 6161150 (S.D. Cal. Oct. 21, 2020). In so doing, the court found defendant's *Arlington Heights* analysis was "fatally flawed," and *Ramos* and *Espinoza* were inapplicable. *Id.* at 2. Further, the court found the defendant did not show

racial discrimination with statistics of disparate impact because "impact is more readily explained by the geographic proximity of the border to Mexico and Latin America than by animus." *Id.* at 3. Finally, the court agreed that rational basis review was the appropriate level of scrutiny and found 8 U.S.C. § 1325(a)(1) to have satisfied that test because the government has a "legitimate interest in deterring illegal entry." *See Id.* at 3-4 (citing *Hernandez-Guerrero*, 147 F.3d at 1078). The above discussion and bases were also used to deny virtually identical challenges in *United States v. Lazcano-Neria* and *United States v. Morales-Roblero*. *See Lazcano-Neria*, No. 3:20-MJ-04538-AHG, 2020 WL 6363685, at \*6 (S.D. Cal. Oct. 29, 2020); *Morales-Roblero*, No. 3:19-MJ-24442-AHG, 2020 WL 5517594, at \*7–10 (S.D. Cal. Sept. 14, 2020).

Furthermore, the Ninth Circuit has upheld both the constitutionality of 8 U.S.C. § 1326, and the counterpart illegal entry violation under 8 U.S.C. § 1325, in a variety of other contexts. *See, e.g.*, *United States v. Bahena-Cardenas*, 411 F.3d 1067, 1072–73 (9th Cir. 2005) ("Section 1326 does not violate the rule of *Apprendi,* which requires that 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.'") (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)); *United States v. Lara-Aceves*, 183 F.3d 1007 (9th Cir. 1999), *cert. denied*, 528 U.S. 1095 (2000) *and overruled on other grounds by United States v. Rivera-Sanchez*, 247 F.3d 905 (9th Cir. 2001) (holding § 1326 did not violate constitutional due process by relying on the administrative adjudication of removal proceedings as an element of the criminal offense); *United States v. Soto-Tafolla*, 156 F.3d 1241 (9th Cir. 1998) (unpublished) (holding section 1326 is not unconstitutionally vague, because the statute clearly states that "a deported person who reenters the country without permission at any time has committed a felony").

And finally, the Ninth Circuit recently had the opportunity to deviate from longstanding precedent on the constitutionality of federal immigration statutes and declined to do so in a published decision, *United States v. Ayala-Bello*. In that case, the Court applied the rational basis test and affirmed the lower court's dismissal of defendants'

claim that their prosecution for illegal entry on the normal criminal docket violated their right to equal protection because they ought to have been prosecuted through the Central Violations Bureau (CVB). No. 19-50366, 2021 WL 1605990, at *1 (9th Cir. Apr. 26, 2021). Therein, the Court noted "immigration is a federal matter," *id.* at 3, and the government has "a legitimate interest in controlling our borders." *Id.* at 4 (citing *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953)). In sum, the constitutionality of 8 U.S.C. § 1326 has long been upheld by the courts, and even in the specific context Gutierrez-Barba challenges it today, the statute readily and easily withstands scrutiny under the rational basis test. Accordingly, Gutierrez-Barba's motion should be denied.

### III.  CONCLUSION

Based on the above, the government respectfully requests that the Court deny Gutierrez-Barba's motion, because he cannot show an equal protection violation.

Respectfully submitted this 17th day of May, 2021.

> GLENN B. McCORMICK
> Acting United States Attorney
> District of Arizona
>
> *s/Alanna Kennedy*
> ALANNA KENNEDY
> ABBIE BROUGHTON MARSH
> Assistant U.S. Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of May, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Jami Johnson & Matthew Deates,
*Attorneys for Defendant*

*s/C. Abramo*
U.S. Attorney's Office