JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2700

JAMI JOHNSON
New York State Bar # 4823373
jami_johnson@fd.org
MATTHEW DEATES
Minnesota State Bar # 0400318
matthew_deates@fd.org
Assistant Federal Public Defenders
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. CR-19-1224-PHX-DJH |
|---|---|
| Plaintiff, | |
| v. | **REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT UNDER *ARLINGTON HEIGHTS*** |
| Martin Gutierrez-Barba, | |
| Defendant. | |

Martin Gutierrez-Barba, through counsel, respectfully submits this Reply to the government's Response to his Motion to Dismiss the Superseding Indictment. *See* ECF No. 74 (Motion to Dismiss); ECF No. 91 (Response).

In a motion to dismiss accompanied by numerous exhibits of congressional records, Mr. Gutierrez explained how the law criminalizing illegal reentry into the United States was created with a discriminatory purpose. Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race" would destroy the racial purity of the United States. Legislators repeatedly referred to Mexicans as "mongrels" and "peons" and claimed they were "poisoning the American citizen." These legislators sought to keep the country's blood "white and purely Caucasian," soliciting reports and testimony from a notorious eugenicist

who likened immigration policy to the "breed[ing] of thoroughbred horses."  And because the crime of illegal reentry has disparately impacted Mexican defendants, 8 U.S.C. § 1326 is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  And, because the government has failed to show that Congress would have passed the 1929 law in the absence of any discriminatory purpose, the law is invalid, and the superseding indictment must be dismissed.

The government contends that subsequent reenactments of the illegal-reentry statute removed any discriminatory intent.  It disagrees that two recent Supreme Court decisions hold that courts may look to the original discriminatory intent behind such laws, even if later reenacted.  The government further argues the disparate impact on Mexican defendants is simply a product of geography, not discrimination.  And finally, the government suggests that rational-basis review applies because § 1326 is an immigration regulation.  The government is wrong on each point.

First, subsequent pro forma reenactments cannot cleanse a law of its discriminatory intent.  Two recent Supreme Court decisions demonstrate how reenacting a law passed with a discriminatory purpose does not cleanse the law of that purpose.  The majority in *Ramos v. Louisiana* rejected Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racist intent, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." 140 S. Ct. 1390, 1401 n.44 (2020).  Then, in *Espinoza v. Montana Department of Revenue*, the majority looked to the law's "checkered tradition" of religious discrimination to overturn it, even though the law was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry."  140 S. Ct. 2246, 2259 (2020).  Concurring, Justice Alito noted that because "I lost, and *Ramos* is now precedent," courts may examine the original motives for a law even where legislators "readopted their rules under different circumstances in later years."  *Id.* at 2268 (quotations omitted).  In short, six Supreme Court Justices have either ratified courts considering a law's discriminatory origins following reenactment or recognized that position as the prevailing one.  *See Ramos*, 140 S. Ct. at 1392–1420; *Espinoza*, 140 S. Ct. at 2268.

This approach also makes sense.  Perhaps if Congress had subsequently grappled with § 1326's racist origins and effects, and decided it was nonetheless good policy, the

government's position would hold water. But the government offers no reasoned justification why any amendment or reenactment—no matter how technical or stylistic—would neutralize all prior legislative history. To the contrary, "[u]nder established canons of statutory construction, it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." *Redmond-Issaquah R.R. Pres. Ass'n v. Surface Transp. Bd.*, 223 F.3d 1057, 1062 (9th Cir. 2000) (cleaned up).

Even apart from *Ramos* and *Espinoza*, Supreme Court jurisprudence on this issue stretches back more than a century. In *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, for instance, the Court explained that a statutory repeal and recodification had no impact on the original intended effect of the substantive provisions because "the new act should be construed as a continuation of the old with the modification contained in the new act." 164 U.S. 1, 11–12 (1896); *see also Pac. Mail S.S. Co. v. Joliffe*, 69 U.S. 450, 458 (1864) ("The new act took effect simultaneously with the repeal of the first act; its provisions may, therefore, more properly be said to be substituted in the place of, and to continue in force with modifications, the provisions of the original act, rather than to have abrogated and annulled them")). Ninety years later, in *Oneida County v. Oneida Indian, Nation of New York State*, the Court applied this same standard, citing the same cases, when interpreting the federal Nonintercourse Act. 470 U.S. 226, 246 & n.18 (1985). The upshot of these decisions is that, "when an existing statute is reenacted by a later statute in substantially the same terms," the "unchanged provisions which are repeated in the new enactment are construed to have been continuously in force." 1 A.N. Singer & J. Singer, Statutes and Statutory Construction (7th ed. 2009) § 23:29.

Requiring legislatures to reevaluate laws previously enacted with a discriminatory intent does not permanently render a law unconstitutional or prevent Congress from legislating on a particular subject. Instead, it merely prevents the unlawful vestiges of the past from moving silently into the present through inertia. As the Supreme Court explained, "a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation." *United States v. Fordice*, 505 U.S. 717, 728 (1992).

Here, nothing in § 1326's legislative history "eradicates policies and practices traceable" to the original discriminatory intent underlying the 1929 law. Nothing in the subsequent legislative history even mentions this racially motivated history. Absent evidence that Congress meaningfully reevaluated the statute, the 1929 law's reenactment with only minor, stylistic changes strongly suggests that that law's purposes and effects endure. *Cf. Pierce v. Underwood*, 487 U.S. 552, 567 (1988) (reasoning that "reenacting precisely the same language would be a strange way to make a change"); *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 484 (1997) (same).

The government also maintains that the disparate impact on Mexican defendants is a product of geography, not discrimination. But this conflates the *reasons* behind a law with the law's *effects*. Section 1326's impact plainly "bears more heavily on one race than another." *See Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). And under *Arlington Heights*, this is all that is required, because a law violates equal protection if its "original enactment was motivated by a desire to discriminate" and it "continues to this day to have that effect." *See Hunter v. Underwood*, 471 U.S. 222, 233 (1985). In other words, the disparate-impact analysis of *Arlington Heights* focuses solely on the law's continuing disparate *effects*, not the *reasons* for those effects. So whether § 1326's continuing disparate effects are a product of geography or discrimination is entirely beside the point.

In *Hunter*, for example, the law's challengers showed that Alabama's voting provision originally "disfranchised approximately ten times as many" black people than white people. *Id.* at 227. The challengers also showed that "[t]his disparate effect persists today" because black people "are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement." *Id.* This was all that was necessary to show disparate impact. *Id.* at 227–33. The law's challengers did not have to show that white and black people committed the relevant disenfranchising offenses at similar rates or disprove any other reason that the law disproportionately disenfranchised black people.

Here, Mr. Gutierrez easily clears this minimal disparate-impact threshold. As his motion to dismiss shows, in the years following the 1929 law's passage, Mexicans comprised

no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[1] That outsize impact continues today: between 2000 and 2010, Mexicans constituted between 87% and 97% of persons apprehended at the border.[2] So it is irrelevant whether § 1326's present disparate impact is a product of "geography" or "discrimination." All that matters is that it continues to impact Mexican and Latinx communities.

The government's characterization of the DACA decision in *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) is also wrong. *See* Resp. at 5 n.3 & 9. The plurality in *Regents* held that disparate impact on Latinx recipients is *alone* not enough to make up an entire *Arlington Heights* claim, as there was "nothing irregular about the history leading up" to DACA's rescission, and public officials' statements there were "unilluminating" on the question of discriminatory purpose. *Regents*, 140 S. Ct. at 1915–16. But this simply reiterates the holding of *Arlington Heights* that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." 429 U.S. at 264–65. *Regents* does not undermine *Hunter*'s basic premise: that disparate impact is evaluated by whether a law continues to have the racist effect its original enactors intended—not whether its current disparate impact is motivated by a current desire to discriminate. *See Hunter*, 471 U.S. at 233.

Furthermore, almost every claim of disparate impact under *Arlington Heights* could be characterized as a "product of geography." For example, the Ninth Circuit has held that planning decisions made with a racist purpose in predominantly or trending Latinx neighborhoods have disparate impacts on Latinx people. *Comm. Concerning Commun. Improvement v. City of Modesto*, 583 F.3d 690, 704–06 (9th Cir. 2009). Educational decisions made with a racist purpose in a predominantly Latinx city have a disparate impact on Latinx students. *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015). Voting decisions made with a racist purpose in a state where some American Indian, Latinx, and Black

---

[1] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, at 138–39 (2010) (citing U.S. Bureau of Prisons, Federal Offenders, Fiscal Years, 1931–36).
[2] Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000–2019, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_0.pdf.

neighborhoods have limited transit and mail access have a disparate impact on those communities. *D.N.C. v. Hobbs*, 948 F.3d 989, 1004–06 (9th Cir. 2020) (en banc). If the government's "geography-not-discrimination" theory was correct, these plaintiffs could never have shown a disparate impact. Yet the Ninth Circuit held in each case they could.

Finally, the government suggests that rational-basis review applies because § 1326 is an immigration regulation. The implication is that, no matter how odious, flagrant, or despicable the racism underlying a law, courts may not consider it because immigration laws passed by Congress are subject to weak or nonexistent judicial review.

But even assuming this is true for immigration laws in general, it is not true for crimes. Over a century ago in *Wong Wing v. United States*, 163 U.S. 228, 237 (1896), the Supreme Court held that Congress's plenary power in enacting the Chinese Exclusion Act did not authorize prosecuting noncitizens for immigration-related crimes without granting the same Fifth and Sixth Amendment rights afforded other defendants. The Court has applied this same rule ever since. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (recognizing that "government detention violates [the Due Process Clause] unless the detention is ordered in a criminal proceeding with adequate procedural protections"); *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1042 (1984) (recognizing additional protections in the criminal context); *United States v. Mendoza-Lopez*, 481 U.S. 828, 837-38 (1987) (same).

The government nevertheless relies on cases such as *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998), to justify rational-basis review. Resp. at 2, 4, 11. But *Hernandez-Guerrero* merely repeats what *Wong Wing* said one hundred years ago: that Congress has the authority to criminalize illegal immigration in the first place. *See Wong Wing*, 163 U.S. at 235; *Hernandez-Guerrero*, 147 F.3d at 1077 (explaining *Wong Wing*'s ruling to that effect). This is a far cry from the government's theory that Congress's plenary power over immigration insulates a racially motivated criminal law from an equal-protection challenge. In fact, *Wong Wing* explicitly distinguished civil and criminal laws, noting that conduct "punishable by deprivation of liberty and property" under criminal law must be subject to constitutional guarantees afforded to criminal defendants. *Wong Wing*, 163 U.S. at 237; *see also Plyler v. Doe*, 457 U.S. 202, 210 n.9 (1982) (recognizing that, despite the executive and legislative branch's "broad authority over both naturalization and

foreign affairs," the Fifth Amendment protects unlawfully present individuals from "invidious discrimination by the Federal Government"). Mr. Gutierrez does not challenge Congress's authority to pass immigration laws as a general matter. Nor does he challenge Congress's authority to criminalize immigration violations as a general matter. *Cf. Hernandez-Guerrero*, 147 F.3d at 1078. His challenge is far more specific: he argues that § 1326 is constitutionally invalid under the longstanding Equal Protection framework of *Arlington Heights*. The government's citations for rational-basis review do not apply.

Put simply, where criminal penalties begin, weak judicial review over immigration legislation ends. Criminal laws—whether immigration-related or otherwise—must comply with the Fifth Amendment. As another example, the Supreme Court in *United States v. Mendoza-Lopez* acknowledged that neither the text nor the legislative history of § 1326 required that a noncitizen's prior deportation order be lawful to convict. 481 U.S. 828, 834–37 (1987). Yet this did not "end [the] inquiry" because a statute that "impose[s] a criminal penalty for reentry after *any* deportation . . . does not comport with the constitutional requirement of due process." *Id.* at 837; *see also United States v. Barajas-Alvarado*, 655 F.3d 1077, 1087 (9th Cir. 2011) (following "exactly the approach" taken by *Mendoza–Lopez*). These cases confirm that even when Congress attempts to cut off protections for noncitizens in criminal immigration proceedings, courts refuse to turn a blind eye to constitutional violations.

Mr. Gutierrez has satisfied his burden to challenge the legality of § 1326 under *Arlington Heights*, and the burden shifted to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266–68, 270 n.21. But rather than attempt to meet its burden, the government simply claims: "There is no need to reach this point." Resp. 10. Accordingly, 8 U.S.C. § 1326 is unconstitutional, and the Court must dismiss the superseding indictment.

. . .

. . .

. . .

. . .

7

Respectfully submitted: May 20, 2021.

JON M. SANDS
Federal Public Defender

*s/Matthew Deates*
MATTHEW DEATES
Assistant Federal Public Defender