UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-19-1224-PHX-DJH |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | June 1, 2021 |
| Martin Gutierrez-Barba, | ) | 9:03 a.m. |
| | ) | |
| Defendant. | ) | <u>REDACTED TRANSCRIPT</u> |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

<u>BENCH TRIAL</u>

APPEARANCES:
For the Government:
        U.S. Attorney's Office
        By: ABBIE BROUGHTON MARSH, ESQ.
           ALANNA RACHEL KENNEDY, ESQ.
        40 North Central Avenue, Suite 1800
        Phoenix, AZ  85004

For the Defendant Gutierrez-Barba:
        Federal Public Defender's Office
        By: JAMI SUZANNE JOHNSON, ESQ.
           MATTHEW JOSEPH DEATES, ESQ.
        850 West Adams Street, Suite 201
        Phoenix, AZ  85007

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

## INDEX

SUMMARY OF COURT PROCEEDINGS                                    PAGE:

Opening Statement
          Government                                            13

Closing Argument
          Government                                            78

Ruling                                                          82

## INDEX OF WITNESSES

<table>
<tr><td>WITNESSES FOR THE<br>GOVERNMENT:</td><td>Direct</td><td>Cross</td><td>Redirect</td><td>The Court</td></tr>
<tr><td>KRAFT, Justin</td><td>17</td><td></td><td></td><td></td></tr>
<tr><td>MOULTON, Ryan</td><td>19</td><td></td><td></td><td></td></tr>
<tr><td>NAVARRO, Juan</td><td>27</td><td></td><td></td><td></td></tr>
<tr><td>ARGUELLES, Michael</td><td>39</td><td></td><td></td><td></td></tr>
<tr><td>DOUGLAS, Starr</td><td>49</td><td></td><td></td><td>60</td></tr>
<tr><td>JOYNER, James</td><td>62</td><td></td><td>75</td><td>74</td></tr>
</table>

## INDEX OF EXHIBITS

<table>
<tr><td>EXHIBIT NO.:</td><td>DESCRIPTION:</td><td>RECEIVED:</td></tr>
<tr><td>1</td><td>October 7, 2009 I-296 with Verification</td><td>42</td></tr>
<tr><td>2</td><td>October 7, 2009 Fingerprint Card from Right Side</td><td>31</td></tr>
<tr><td>3</td><td>September 28, 2019 I-213 (Redacted and Sanitized)</td><td>25</td></tr>
<tr><td>4</td><td>September 28, 2019 Fingerprint Card</td><td>26</td></tr>
<tr><td>5</td><td>May 20, 2021 Report of CBP Fingerprint Analyst<br>Starr Douglas</td><td>55</td></tr>
<tr><td>6</td><td>October 7, 2009 I-296 with Notice to Alien</td><td>33</td></tr>
<tr><td>7</td><td>October 7, 2009 I-867A Sworn Statement (Redacted<br>and Sanitized)</td><td>34</td></tr>
<tr><td>8</td><td>October 7, 2009 I-867B Sworn Statement Jurat</td><td>37</td></tr>
<tr><td>10</td><td>October 7, 2009 I-860 Notice & Order of Expedited<br>Removal (Redacted and Sanitized)</td><td>38</td></tr>
<tr><td>12</td><td>May 24, 2015 I-294 Warning</td><td>68</td></tr>
<tr><td>13</td><td>May 24, 2015 I-205 Warrant & Departure<br>Verification</td><td>71</td></tr>
</table>

UNITED STATES DISTRICT COURT

1          THE CLERK:  This is case number CR 19-1224,

2    United States of America versus Martin Gutierrez-Barba, on for

3    bench trial.

4          MS. KENNEDY:  Good morning, Your Honor.

5          Alanna Kennedy and Abbie Marsh for the United States.

6          THE COURT:  Good morning.

7          MS. JOHNSON:  Good morning, Your Honor.  Jami Johnson

8    and Matthew Deates for Martin Gutierrez-Barba, who is present

9    and out of custody.

10         THE COURT:  And good morning.

11         And I have received the signed waiver of trial by

12   jury, and let me sign that.

13         MS. KENNEDY:  Your Honor, I know that the Court

14   discussed --

15         THE COURT:  One moment.

16         MS. KENNEDY:  Okay.

17         THE COURT:  All right.  So I have two stipulations

18   here.  One is with regard to Exhibit 5.  And it appears that

19   Mr. Gutierrez-Barba has had his fingerprints taken and that

20   there is a stipulation that the fingerprints analyzed in

21   Exhibit 5 are associated with the A-file No. 079227444.

22         MS. MARSH:  Your Honor, that's not accurate.

23         He did not have his fingerprints taken, and the two

24   stipulations you're looking at are the same stipulation.  One

25   is redacted, and one is not redacted.  He did not have his

1   fingerprints taken.  The stipulation is meant to say that had

2   he had his fingerprints taken, they would match.  Yeah, they

3   would match the fingerprints analyzed in Exhibit 5 and in the

4   A-file ending 444.

5           THE COURT:  So -- Well, I'm confused.  I don't know.

6   You're stipulating to something that's not written here.

7           MS. MARSH:  It is written there.  That's what it's

8   meant to -- And if that's not how the Court reads it, maybe we

9   need to reword the stipulation.  He's saying his fingerprints

10  as he sits here today match the exhibits analyzed in the report

11  and the documents in the A-file, without having had them

12  rolled, without having had them actually compared.

13          THE COURT:  Well, obviously they were prepared at some

14  point.

15          MS. MARSH:  No.  His -- Yes, fingerprints contained in

16  the -- So there are four exhibits in the A-file.

17          THE COURT:  Let's start with this.  Okay.  Exhibit 5.

18          MS. MARSH:  Right.  Exhibit --

19          THE COURT:  Obviously it's ambiguous, so maybe you

20  should start from scratch.

21          MS. MARSH:  Certainly.

22          THE COURT:  Maybe write something about previously

23  obtained Exhibit 5 or something to that effect, so that it's

24  crystal clear.

25          MS. MARSH:  Well, may I explain to the Court what we

1    anticipate the testimony -- We are going to call the

2    fingerprint analyst to testify to the contents of Exhibit 5.

3    The fingerprint analyst will testify that she compared four

4    documents from the A-file that contained fingerprints.  She

5    will say all four of those match each other.  They are the same

6    fingerprints on all four of those documents contained in the

7    A-file associated with the defendant.

8            This stipulation is because the defendant did not want

9    to or didn't have his fingerprints rolled after his most recent

10   encounter with law enforcement, which took place on September

11   28th of 2019.

12           This stipulation is meant to say that the fingerprints

13   that the analyst compared in Exhibit 5 are the defendant's

14   fingerprints.  And she is available to testify to what she did

15   in her report, which is Exhibit 5.

16           THE COURT:  Well, then why don't we just have that

17   testimony.

18           MS. MARSH:  We intend to have that testimony.  The

19   necessity of the stipulation is that extra step to say that

20   that is the defendant who is seated here today for the purpose

21   of the stipulation.

22           THE COURT:  Well, that's fine.

23           Now, let's --

24           MS. MARSH:  So our question and the reason we provided

25   two copies of the stipulation to you prior to lodging it in any

Case 2:19-cr-01224-DJH   Document 161   Filed 10/28/21   Page 6 of 96

6

1   way was that there's a redacted version that has not the entire
2   A-file number.  The redacted version has just the last three of
3   the A-file number because it's similar to a social security
4   number, so we typically don't file documents with it or we
5   redact it in documents.  For purposes of the trial, I'm not
6   sure that's necessary.  We just prepared the stipulation in two
7   forms.
8          THE COURT:  Well, it should then say redacted, and it
9   doesn't.  It just -- It's the same exact thing.  I think
10  you're -- I think you can write redacted under there.
11         MS. MARSH:  Sure.  And we don't need to file both.  We
12  were asking the Court's preference of whether you would prefer
13  that we do the redacted version or the standard version
14  containing the entire A-file number.
15         THE COURT:  Ms. Johnson, do you have a preference?
16         MS. JOHNSON:  Your Honor, our office has typically not
17  treated A-file numbers as personally identifying information,
18  and it's not one of the categories of information listed on the
19  ECF mandatory redaction rules.  We don't have an objection to
20  having his A-file number docketed.  I think it's probably
21  already attached to the exhibits to some of our motions at this
22  point.
23         THE COURT:  All right.  That takes care of that.  All
24  right.  We left the question about identification of
25  Mr. Gutierrez-Barba, and I've considered that.  And here's what

1    my preference is.

2           The government will let me know when you intend to

3    call the witness for identification purposes.  Before that

4    witness comes into the courtroom, I will permit everyone, so

5    long as -- I'm assuming at least counsel here are vaccinated.

6    I don't know about Mr. Gutierrez-Barba.  But I'm assuming those

7    who are at counsel table have all been vaccinated.  We will all

8    remove our masks before that identification witness comes in,

9    including Mr. Gutierrez-Barba, for the duration of that

10   testimony.

11          MS. JOHNSON:  Your Honor, I'm not entirely sure which

12   witness the government intended to have identify Mr. Gutierrez,

13   but if it's the agent who arrested him on September 28th, we

14   will stipulate that the individual sitting here next to me is

15   the individual who was arrested on September 28th, 2019, if

16   that just expedites things.  We're not contesting that he's the

17   person who was arrested and charged.

18          MS. KENNEDY:  And just to clarify, would that also

19   cover the September 27, 2019, encounter with Phoenix Police

20   Department that he was ultimately transferred to ICE custody?

21          MS. JOHNSON:  Yes.  That he is the person who was

22   arrested in September and taken to ICE.

23          MS. KENNEDY:  That's fine with the government, Your

24   Honor.

25          THE COURT:  All right.  So when I hear "That's fine,"

1   do you mean you're not going to call that witness, or you will

2   call that witness --

3           MS. KENNEDY:  We are calling that witness for other

4   purposes, but we don't need to have him ID the defendant.

5           THE COURT:  All right.  So then you will keep your

6   masks on for the duration.

7           All right.  And is there anything else that we need to

8   discuss?

9           MS. KENNEDY:  Your Honor, I know the Court briefly

10  went over the defendant's right to a jury trial and his waiver

11  of that right last week.  If possible, would the Court be

12  willing to do a little bit longer of a colloquy and go over his

13  waiver of that right in more detail?

14          THE COURT:  I don't know what it is that you -- what

15  additional information you need.  He's also signed a stipulated

16  waiver of jury trial as well as a stipulated -- I'm sorry -- a

17  waiver of stipulated or special findings of fact.  Did you go

18  over the transcript?  Did you find something wanting?

19          MS. KENNEDY:  Your Honor, I believe that just the

20  waiver in and of itself is insufficient under the case law to

21  have a knowing and voluntary waiver.  And so I do believe the

22  Court needs to inquire into his competency and to the

23  voluntariness.  And, I mean, I know that the Court did talk

24  about the disadvantages and advantages of a jury trial

25  vis-a-vis Ms. Johnson and her conversations with

1    Mr. Gutierrez-Barba.  But I just know we would be more

2    comfortable if there was a few more questions about competency

3    and voluntariness.

4              THE COURT:  Is there anything in the government's file

5    that indicates that Mr. Gutierrez-Barba is not competent to

6    proceed to jury trial or to trial?

7              MS. KENNEDY:  No, Your Honor.

8              THE COURT:  Ms. Johnson, is there anything in your

9    representation of Mr. Gutierrez-Barba that leads you to believe

10   that he is competent or not competent to proceed to a bench

11   trial?

12             MS. JOHNSON:  I have no concerns about his competency.

13   I believe that he is competent.

14             THE COURT:  And we've already discussed that he does

15   not need an interpreter, and he has indicated as much, as has

16   Ms. Johnson.

17             And we have stated to Mr. Gutierrez-Barba that he

18   understands that at any time in the proceedings if he wishes to

19   have a Spanish-speaking interpreter, that he may ask for one.

20             What else?  Ms. Marsh?

21             MS. MARSH:  One moment, Your Honor.

22             I think my co-counsel is reviewing a list, and I think

23   that we just would like some clarification that this is a

24   knowing and voluntary waiver, just like we would in a change of

25   plea colloquy.  I think that that -- Just like we would in a

| | |
|---|---|
| 1 | change of plea colloquy to understand that he is not under the |
| 2 | influence of any medications and that this is knowing and |
| 3 | voluntary. |
| 4 | THE COURT:  Mr. Gutierrez-Barba, in the last 48 hours, |
| 5 | have you had any sort of drug, alcohol, or medication? |
| 6 | THE DEFENDANT:  No, ma'am. |
| 7 | THE COURT:  And are you under currently the treatment |
| 8 | of any sort of mental health or any other sort of medical |
| 9 | treatment provider? |
| 10 | THE DEFENDANT:  No. |
| 11 | THE COURT:  And as we discussed last week, it is your |
| 12 | choice to have your trial not by a jury but by a judge; is that |
| 13 | correct? |
| 14 | THE DEFENDANT:  Yes. |
| 15 | THE COURT:  And you have fully discussed all of the |
| 16 | potential outcomes with your counsel; is that correct? |
| 17 | THE DEFENDANT:  Yes. |
| 18 | THE COURT:  And no one has forced you into that |
| 19 | decision?  It is a decision that you have made with the advice |
| 20 | of your counsel? |
| 21 | THE DEFENDANT:  Yes. |
| 22 | THE COURT:  All right.  Let's proceed. |
| 23 | MS. KENNEDY:  Your Honor, we have one other matter to |
| 24 | take up with the Court, and it was regarding potential |
| 25 | stipulations, the foundation of several exhibits.  The Court |

1   had asked us to confer about that last week, and we have been

2   in communication with defense counsel.  And it's our

3   understanding that they are willing to stipulate to several

4   exhibits' foundation.  And I just wanted to put that on the

5   record and allow Ms. Johnson the opportunity to clarify if she

6   has a different understanding.

7           MS. JOHNSON:  Your Honor, we have agreed to waive all

8   possible objections to -- as to foundation with respect to any

9   exhibits.

10          We, as we said last week, we are asking for this trial

11  for the purpose of preserving our previously stated legal

12  arguments.  We are not raising any factual defenses.  We stand

13  by and are not waiving our previously stated legal arguments,

14  motions, objections and arguments, and -- but do not intend to

15  offer any argument or evidence or objections today.

16          THE COURT:  That sounds different than a stipulation.

17          MS. KENNEDY:  That's correct, Your Honor.  And that's

18  why I wanted to have this conversation on the record.  So are

19  we, just to clarify, Ms. Johnson -- And we had told defense

20  counsel that the exhibits that we intend to admit today are

21  Exhibits 1 through 8, 10, and 12 through 13, for a total of 11

22  exhibits.  So it's our understanding that you will not be

23  objecting to foundational issues for any of those 11 exhibits?

24          MS. JOHNSON:  Yes, that's correct.  We waive any

25  objections to the foundation.

1          MS. KENNEDY:  Would Your Honor consider conditionally

2     admitting those exhibits at this time pending testimony by

3     those witnesses?

4          THE COURT:  No.  Why don't we just move forward.

5          MS. KENNEDY:  Thank you, Your Honor.

6          MS. MARSH:  Your Honor, I apologize.  We have one

7     additional matter pending.  We filed a motion this morning, in

8     an abundance of caution, based on a Henthorn-related disclosure

9     we made to defense counsel, and I don't know if the Court has

10    received that motion.  But if you haven't, I can explain it.

11    But I would seek a ruling on that.  It goes -- It's our last

12    witness's testimony.

13         THE COURT:  Well, I will look at it over the lunch

14    hour.

15         MS. MARSH:  Understood.  We filed it this morning in

16    an abundance of caution because it was just not clear.  We

17    asked defense counsel if they would want to inquire as to this

18    matter.  And the response was not entirely clear.  So we'd just

19    ask for a ruling prior to his testimony, if that's okay.

20         THE COURT:  And in fact, you know, at this point,

21    knowing you've had this trial, I may just do away with whatever

22    it is that you're proposing that this relates to in terms of

23    evidence.  I mean, at some point you have to comply with the

24    Court's deadlines.

25         MS. MARSH:  Your Honor, this is a matter --

1          THE COURT:  And at some point, especially on the

2     morning of trial, to be filing motions and then asking for a

3     ruling, I don't know what the possible hold-up could be.

4          MS. MARSH:  I can explain.

5          THE COURT:  I don't need an explanation now.

6     Hopefully it's in your motion.

7          MS. MARSH:  It is.  And I apologize for the tardiness.

8     I do.

9          THE COURT:  Well, sometimes apologies only go so far.

10         MS. MARSH:  Understood.

11         THE COURT:  All right.  Please proceed.

12         MS. MARSH:  Would the Court like any form of opening,

13     or would you like us to call our first witness?

14         THE COURT:  It is your case.

15         MS. KENNEDY:  Good morning, Your Honor.  This is a

16     simple case.  The defendant, Martin Gutierrez-Barba, is charged

17     with violating 8 United States Code Section 1326(a) and

18     specifically that on or about September 27th, 2019, he was

19     found near Phoenix, Arizona, in the District of Arizona, after

20     having been previously denied admission, excluded, deported,

21     and removed from the United States near Nogales, Arizona, on or

22     about December 18th, 2009.  And he did not obtain the express

23     consent of the Attorney General or the Secretary of the

24     Department of Homeland Security to reapply for admission to the

25     United States.

1    As the Court is aware, the government is required to

2 prove beyond a reasonable doubt that:

3    First, the defendant was removed from the

4 United States;

5    Second, he voluntarily entered the United States

6 afterwards;

7    Third, after entering the United States, he knew that

8 he was in the United States and knowingly remained;

9    Fourth, he was found in the United States without

10 having obtained the consent of the Attorney General or the

11 Secretary of the Department of Homeland Security to reapply for

12 admission to the United States;

13    Fifth, he was an alien at the time of his entry into

14 this country; and

15    Sixth, that he was free from official restraint at the

16 time he entered.

17    The Court is going to hear from six government

18 witnesses who will testify to the following:

19    First, Phoenix Police Officer Justin Kraft will

20 testify about how he found the defendant in Phoenix on

21 September 27th, 2019, and how an immigration check was

22 performed during booking.

23    Second, the Court will hear from ICE Deportation

24 Officer Ryan Moulton, who will testify about how he processed

25 the defendant at the ICE Enforcement Removal Operations Office,

1    and he will talk about how he confirmed the defendant's

2    identity that he is a citizen of Mexico and matched him to his

3    prior immigration history.

4         Third, the Court will hear from United States Customs

5    and Border Protection Officer Juan Navarro, who will testify

6    about the defendant's October 7th, 2009, expedited removal at

7    the border, the defendant's sworn statement acknowledging he is

8    not a United States citizen and that he is a citizen of Mexico.

9         Fourth, the Court will hear from Border Patrol Agent

10   Michael Arguelles, who will testify about the defendant's

11   actual removal from the United States on December 18th, 2009.

12        Fifth, the Court will hear from Customs and Border

13   Protection Fingerprint Specialist Starr Douglas who will talk

14   about her findings in matching the defendant's fingerprints

15   from his A-file and her conclusions in her report.

16        Sixth and finally, the Court will hear from ICE

17   Deportation Officer James Joyner, the case agent.

18   Officer Joyner will testify about the warnings defendant

19   received about his consequences for reentry and possible future

20   prosecution should he ignore those warnings.

21        He will testify how he determined that the defendant

22   entered this country without being under official restraint,

23   and he will testify that the defendant did not apply for

24   admission or receive permission from the U.S. Government to be

25   in the United States in between when he was removed on December

1    18th, 2009, and the day he was found in the United States by

2    immigration officials on September 27th, 2019.

3              Based on their testimony and the evidence, we ask the

4    Court to find the defendant guilty of the charge in the

5    superseding indictment, reentry of a removed alien.

6              THE COURT:  Ms. Johnson, do you wish to make an

7    opening statement?

8              MS. JOHNSON:  We do not, but I would just like on the

9    record that we are happy to stipulate that Mr. Gutierrez is a

10   citizen of Mexico.  We are happy to stipulate that he was found

11   in Phoenix in 2019 and that he was subject to the removal order

12   that's already been discussed and subject to our 1326(d)

13   motion.

14             I'm certainly not going to tell the government how to

15   proceed with its case, but we are happy to stipulate to all of

16   those facts if it streamlines anything.

17             THE COURT:  And so is the government willing to so

18   stipulate?

19             MS. KENNEDY:  No, Your Honor.  We had tried to discuss

20   that with defense counsel earlier.  We do not want to do a

21   stipulated facts trial for reasons we've discussed with defense

22   counsel and informed the Court as much last week.  So we would

23   like to proceed with putting on our evidence through the

24   witnesses.

25             THE COURT:  All right.  Call your first witness.

1          MS. KENNEDY:  Your Honor, the government calls Phoenix

2    Police Officer Justin Kraft.

3          THE COURT:  Sir, please come forward and be sworn.

4           JUSTIN KRAFT, GOVERNMENT'S WITNESS, SWORN

5          THE COURT:  You may proceed.

6          MS. KENNEDY:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8    BY MS. KENNEDY:

9    Q.  Good morning, Officer Kraft.  Can you please state and

10   spell your name for the record.

11   A.  My name is Officer Justin Kraft, J-u-s-t-i-n K-r-a-f-t.

12   Q.  Where do you work?

13   A.  City of Phoenix.

14   Q.  And what do you do for the City of Phoenix?

15   A.  I'm a patrol officer in the City of Phoenix.

16   Q.  How long have you worked there?

17   A.  I've been there now for four years.

18   Q.  What is your position?

19   A.  I'm part of Maryvale Neighborhood Enforcement Team.

20   Q.  And what are your primaries and -- excuse me.  What are

21   your primary duties and responsibilities?

22   A.  We do probable cause pickups for detectives.  We work

23   problem areas, work drug houses, and stuff like that.

24   Q.  What type of training have you had?

25   A.  I attended the Arizona Law Enforcement Academy along with

1    POST academy that put on for just Phoenix specific policies.

2    And yearly we also have mandatory training that we have to

3    complete to keep our Arizona POST certification.

4    Q.  What prior work experience have you had?

5    A.  I have previous experience in corrections along with 14

6    years of military experience.

7    Q.  Were you working on September 27th, 2019?

8    A.  I was.

9    Q.  As part of your work that day, did you encounter the

10   defendant, Martin Gutierrez-Barba?

11   A.  Yes, I did.

12   Q.  How did you come into contact with the defendant?

13   A.  The defendant was dropped off to me by Gilbert Police

14   Department.

15   Q.  How did you confirm the defendant's identity?

16   A.  Each precinct has what's called a Digiscan.  We use their

17   fingerprints to confirm or deny their identity.

18   Q.  So when you say you use the Digiscan to confirm or deny

19   their identity, did you in fact confirm who the defendant was

20   through the Digiscan?

21   A.  Yes, I did.

22   Q.  What did you do with the defendant after you confirmed his

23   identity?

24   A.  After I did my pre-booking at South Mountain Precinct, I

25   transported him to Fourth Avenue Jail, where I handed him off

1      to the City of Phoenix detention officers.  And then they

2      proceeded through the stations that they're required to go

3      through.

4      Q.  What type of stations are they required to go through?

5      A.  They go through stations such as medical, stations

6      specifically for MCSO along with ICE.

7               MS. KENNEDY:  May I have a moment, Your Honor?

8               THE COURT:  Yes.

9               MS. KENNEDY:  Does the Court have any questions for

10     this witness?

11              THE COURT:  No.

12              MS. KENNEDY:  No further questions.

13              THE COURT:  Ms. Johnson.

14              MS. JOHNSON:  No questions.

15              THE COURT:  Sir, thank you.  You may step down.

16              Call your next witness.

17              MS. KENNEDY:  Your Honor, the government calls

18     Immigration and Customs Enforcement Officer Ryan Moulton.

19              THE COURT:  Sir, please come forward and be sworn.

20              RYAN MOULTON, GOVERNMENT'S WITNESS, SWORN

21                          DIRECT EXAMINATION

22     BY MS. KENNEDY:

23     Q.  Good morning, Officer Moulton.  Can you please state and

24     spell your name for the record.

25     A.  My name is Ryan Moulton.  First name R-y-a-n, last name

1    Moulton, M-o-u-l-t-o-n.

2    Q.  Where do you work?

3    A.  I work for Immigration and Customs Enforcement here in

4    Phoenix.

5    Q.  And is that part of the Department of Homeland Security?

6    A.  Yes, ma'am.

7    Q.  What is your current position at ICE?

8    A.  Deportation officer.

9    Q.  How long have you been in that current position?

10   A.  About five years now.

11   Q.  What did you do prior to becoming a deportation officer

12   about five years ago?

13   A.  Prior to that I was an enforcement and removal assistant

14   still with Immigration and Customs Enforcement.

15   Q.  What type of training have you had?

16   A.  I had basic federal law enforcement training along with

17   basic immigration training and a fugitive operations course.

18   Q.  And throughout your training, were you also taught about

19   different types of immigration documents?

20   A.  Yes, ma'am.

21   Q.  So let's turn back to your role as a deportation officer.

22   What types of units and assignments have you held since you've

23   been in that position?

24   A.  So my first unit from September, 2016, to about January,

25   2020, I was in the criminal alien program.  And after that,

1    from January, 2020, till April of this year, I was in the

2    fugitive operations unit.  And from April until now of this

3    year I'm in the alternatives to detention unit.

4    Q.  So in September 2019, when Mr. Martin Gutierrez-Barba was

5    encountered by immigration authorities, you were part of the

6    criminal alien program?

7    A.  Yes, ma'am, that's correct.

8    Q.  What were your primary duties and responsibilities in that

9    role?

10   A.  In that role, for any individuals who came into our

11   custody, our role was to process them, to determine whether

12   they would see an immigration judge or would be subject to

13   removal.

14   Q.  And what does that processing look like?

15   A.  So first we would take fingerprints to determine their

16   immigration status along with immigration records databases.

17   And if they had not been encountered by immigration before, we

18   would set them up to see an immigration judge.  If they had

19   been ordered removed before, we would set them up for removal

20   again.

21   Q.  What types of questions do you typically ask individuals

22   with regard to immigration status?

23   A.  I would ask them first what country they were born in and

24   if they had any legal status in the United States or any

25   United States citizen family.

1    Q.  How do you confirm whether an individual has any type of

2    status in the United States?

3    A.  Through their fingerprints and immigration databases.

4    Q.  Were you working on September 28th, 2019?

5    A.  Yes, ma'am, I was.

6    Q.  Did you encounter the defendant, Mr. Martin

7    Gutierrez-Barba, on September 28th, 2019?

8    A.  Yes, ma'am.

9    Q.  How did you encounter him?

10   A.  He was released from the Maricopa County Fourth Avenue Jail

11   and was transported straight to our office here in Phoenix.

12   And that was where I encountered him when he was booked into

13   our office.

14   Q.  And you confirmed his identification?

15   A.  Yes, ma'am.

16   Q.  And how did you do that?

17   A.  By asking him his name and through his fingerprints.

18   Q.  What other methods did you confirm -- did you use to

19   confirm his identity during processing?

20   A.  Just fingerprints and immigration databases.

21   Q.  Did you ask him any questions?

22   A.  Yes, ma'am, I did.

23   Q.  Would those have been the same questions you typically ask

24   other individuals?

25   A.  That is correct.

23

1    Q.  What did the defendant say?

2    A.  That he was born in Mexico and did not have any legal

3    status here in the United States.

4    Q.  All right.  So my co-counsel is now going to pull up what's

5    been previously marked for identification purposes as

6    Government Exhibit 3.  Do you recognize Exhibit 3?

7    A.  Yes, ma'am, I do.

8    Q.  What is it?

9    A.  That is an I-213, otherwise known as a record of deportable

10   or inadmissible alien.

11   Q.  Who completed --

12             THE CLERK:  Can you use the handheld mike?

13             THE WITNESS:  Is that better?

14             THE COURT:  Try it again.

15   Q.  (BY MS. KENNEDY)  Do you recognize Exhibit 3?

16   A.  Yes, ma'am, I do.

17   Q.  What is it?

18   A.  It is called an I-213, a record of deportable or

19   inadmissible alien.

20   Q.  Who completed this form?

21   A.  I did.

22   Q.  How do you know you completed it?

23   A.  Because my name and signature are on it.

24   Q.  Have you reviewed this document in preparation for

25   testifying today?

UNITED STATES DISTRICT COURT

1    A.   Yes, I did.

2    Q.   And is what's shown Page 1 of a four-page report?

3    A.   Yes, ma'am.

4    Q.   Is that a fair and accurate representation of the first

5    page?

6    A.   Yes, ma'am.

7              MS. KENNEDY:  Your Honor, at this time I move to admit

8    Exhibit 3 into evidence.

9              THE COURT:  I'm sorry.  I'm looking at your exhibit

10   binder, and you just asked him if he was looking at Page 1 of a

11   four-page report.  In fact, I think we're all looking at Page

12   2, which Page 1 is a certification of documents form.

13             MS. KENNEDY:  I apologize, Your Honor.  That's

14   correct.  We do have the certification form on the first page.

15   Q.   (BY MS. KENNEDY)  So is this the second page but the first

16   page of the actual Form I-213?

17   A.   That's correct, yes.

18             MS. KENNEDY:  Your Honor, at this time I move to admit

19   that exhibit into the record.

20             THE COURT:  It will be admitted.  But just for

21   clarification, you said it was a four-page form?  There's only

22   two pages on it.

23             MS. KENNEDY:  It is, Your Honor.  The full version is

24   actually at Exhibit 27.  We had redacted and sanitized it in

25   preparation for the jury trial.  And we're only relying on the

1   first page or the second page.

2            THE COURT:  All right.  It may be admitted.

3            MS. KENNEDY:  Thank you.

4   Q.  (BY MS. KENNEDY)  Officer Moulton, please explain what the

5   purpose of this document is.

6   A.  This document is to reflect an individual's biographic

7   information along with our report of how we encountered an

8   individual along with their criminal and immigration history.

9   Q.  And please explain what information specifically is on Page

10  2 or the first page of the I-213.

11  A.  This is an individual's biographic information.

12  Q.  Are there fingerprints on that page?

13  A.  Yes, ma'am, there are.

14  Q.  And whose name is on -- Which -- Whose name is on that

15  document or who does it pertain to?

16  A.  Are you talking the individual or my name?

17  Q.  The individual whom this document is about.

18  A.  Martin Gutierrez-Barba.

19  Q.  Does it also have his A-number on this document?

20  A.  Yes, ma'am, it does.

21  Q.  Does that number end in 444?

22  A.  That's correct.

23  Q.  All right.  My co-counsel is now going to show you what has

24  been marked for identification purposes as Government Exhibit

25  4.

MOULTON - DIRECT                                      26

1              Officer Moulton, this is a three-page document.  Do

2      you recognize Pages 2 and 3 of that document?

3      A.  Yes, ma'am.

4      Q.  What is it?

5      A.  This is an FD-249 -- excuse me -- fingerprint card.

6      Q.  Who completed this form?

7      A.  I did.

8      Q.  How do you know you completed this form?

9      A.  My name and signature are on it.

10     Q.  Have you reviewed this FD-249 fingerprint form in

11     preparation for coming to testify today?

12     A.  Yes, ma'am.

13     Q.  And is what's shown a fair and accurate representation of

14     the FD-249 that you completed?

15     A.  Yes, ma'am.

16            MS. KENNEDY:  Your Honor, at this time I move to admit

17     Exhibit 4 into evidence.

18            THE COURT:  And Exhibit 4 may be admitted.

19            MS. KENNEDY:  Thank you.

20     Q.  (BY MS. KENNEDY)  So what did you do with this form,

21     Officer Moulton?

22     A.  I used this to take the individual's fingerprints.

23     Q.  Did you take those fingerprints on September 28th, 2019?

24     A.  Yes, ma'am.

25            MS. KENNEDY:  No further questions for this witness,

1    Your Honor, unless the Court has any.

2              THE COURT:  No.  Ms. Johnson.

3              MS. JOHNSON:  No questions.

4              THE COURT:  All right, sir.  Thank you.  You may step

5    down.

6              Call your next witness.

7              MS. MARSH:  The government calls Customs and Border

8    Protections Officer Juan Navarro.

9              THE COURT:  Sir, please come forward and be sworn.

10               JUAN NAVARRO, GOVERNMENT'S WITNESS, SWORN

11             MS. MARSH:  May I proceed, Your Honor?

12             THE COURT:  Yes.

13                           DIRECT EXAMINATION

14   BY MS. MARSH:

15   Q.  Good morning, Officer Navarro.

16   A.  Good morning.

17   Q.  What is your job description or your job title?  Sorry.

18   A.  U.S. Customs and Border Protection Officer.

19   Q.  And have you testified previously in this matter?

20   A.  Yes, I did.

21   Q.  So the Court may be familiar with your training and

22   experience, but I'm going to just review it very briefly for

23   the record.  How long have you been working with Customs and

24   Border Protection?

25   A.  Since October of '95.

1   Q.  And prior to that, did you work with Border Patrol?

2   A.  Yes.  In October of '95 I started with Border Patrol.

3   Q.  And did you attend an academy when you became employed by

4   Border Patrol?

5   A.  Yes, I did.

6   Q.  And did that include training on processing immigration

7   including all of the forms associated with immigration

8   detainees?

9   A.  Yes, it did.

10  Q.  And back in October of 2009, were you working at the

11  Nogales port of entry?

12  A.  Yes.  I was on temporary duty assignment for three months.

13  Q.  So while you were there for that temporary duty assignment,

14  what were those three months?  What was that time period?

15  A.  It was from September, 2009, until December of 2009.

16  Q.  And what were you -- Why were you detailed there?  Why were

17  you there on a temporary duty assignment?

18  A.  The southern border decided to create a special operation.

19  They needed officers to come and help.

20          THE COURT:  Let me just inquire.  Ms. Johnson,

21  Mr. Deates, are you able to hear him from there?

22          MS. JOHNSON:  We can, yes.

23          THE COURT:  I just want to make sure.  I think that

24  microphone -- If you just hold it a little closer, it should --

25          THE WITNESS:  Okay.

NAVARRO - DIRECT                                    29

1          THE COURT:  There we go.

2    Q.  (BY MS. MARSH)  And while you were -- Sorry.  That was a

3    piece of my pen.  I was fidgeting.  I apologize.

4          While you were working at the Nogales port of entry,

5    what was your role?  What was your assignment?

6    A.  Mostly I was assigned to work in passport control secondary

7    processing immigration cases.

8    Q.  So was that work as an enforcement officer?

9    A.  No.  Just as a regular secondary immigration officer

10   processing cases.

11   Q.  So what do you mean by processing cases?

12   A.  Once a person was apprehended in primary and they were

13   deemed to be inadmissible, that person will be sent over to

14   immigration secondary for immigration processing.

15   Q.  And I want to turn your attention specifically to October

16   7th of 2009.  Were you working that day?

17   A.  Yes, I was.

18   Q.  And did you process the defendant in this case, Martin

19   Gutierrez-Barba?

20   A.  Yes, I did.

21   Q.  Do you have an independent memory of that encounter?

22   A.  No, I do not.

23   Q.  During the pendency of this proceeding, this case, have you

24   reviewed all of the documents associated with that particular

25   date and those interactions?

NAVARRO - DIRECT

1    A.  Yes, I have.

2    Q.  And do you recognize your signature and name on those

3    documents that you've reviewed?

4    A.  Yes, I do.

5    Q.  Specifically I'm going to ask my co-counsel to show you

6    what's been previously marked as Exhibit 2, if we could go to

7    Page 2 of that document.

8            Do you recognize this document?

9    A.  Yes.  This is the fingerprint card.

10   Q.  And what's the purpose of the fingerprint card in

11   immigration processing?

12   A.  Well, we take fingerprints to verify if the person has any

13   prior immigration violations or any criminal violations.

14           MS. MARSH:  I don't think this is the right exhibit.

15           One moment, Your Honor.

16   Q.  (BY MS. MARSH)  Okay.  So you're being shown Exhibit -- the

17   exhibit, the fingerprint card that we're referencing.

18           Do you recognize your name on this document?

19           MS. KENNEDY:  Hold on one second.

20           MS. MARSH:  One moment, Your Honor.

21           Sorry.  The computer program appeared to be pulling up

22   the wrong exhibit, but it is the correct exhibit.

23   Q.  (BY MS. MARSH)  So do you recognize your name on this

24   exhibit?

25   A.  Well, I can see my stat number, the 6510, and my

1    handwriting.

2    Q.  And then on the first page do you recognize the defendant's

3    name, Martin Gutierrez-Barba?

4    A.  Yes.

5    Q.  And based on your review of this document, did you roll

6    these prints or prepare these prints?

7    A.  Yes, I did.

8    Q.  And how do you do that?

9    A.  On a machine.  It's an inkless machine.

10                MS. MARSH:  I'd move to admit Exhibit 2, Your Honor.

11                THE COURT:  I'm sorry.  You recognized your staff

12   number where?

13                THE WITNESS:  On the back of the fingerprint card, the

14   6510.  That's my badge number.

15                THE COURT:  On the left-hand side of the page?

16                THE WITNESS:  Yes, Your Honor.

17                THE COURT:  All right.  Exhibit 2.  Ms. Johnson?

18                MS. JOHNSON:  No objection.

19                THE COURT:  All right.  Exhibit 2 is admitted.

20   Q.  (BY MS. MARSH)  Your Honor, now I would like my co-counsel

21   to show the witness Exhibit 6.

22                I'm sorry.  Let me ask one follow-up question.  I

23   think it's dated, but did you take those fingerprints on

24   October 7th of 2009?

25   A.  Yes.

1    Q.   From Exhibit 2.

2            Okay.  Now turning your attention to Exhibit 6, are

3    you familiar with this document?

4    A.   Yes.  It's the I-296.

5    Q.   And what's the purpose of an I-296 in immigration

6    proceedings?

7    A.   It's known as alien ordered removed.  It lets the alien

8    know that he's being removed and how long he's being barred

9    from the U.S.

10   Q.   And do you recognize the defendant's name, Martin

11   Gutierrez-Barba, on this form?

12   A.   Yes, I do.

13   Q.   And is the defendant's A-number ending 444 in the upper

14   right-hand corner under the file number?

15   A.   Yes, it is.

16   Q.   And do you see your name about halfway down the form?

17   A.   Yes, I do.

18   Q.   And is this form divided into two parts?

19   A.   Yes, it is.

20   Q.   Why is that?

21   A.   The top notice is indicating how long the person is being

22   removed, and then the bottom portion is a verification when

23   he's removed from the U.S.

24   Q.   And did you give notice to the defendant that he was being

25   removed for a period of 20 years?

1    A.   Yes.

2    Q.   And then did you complete the bottom portion?

3    A.   No.

4    Q.   Was that completed later by a different officer?

5    A.   Yes, it was.

6         MS. MARSH:  I'd move to admit Exhibit 6.

7         THE COURT:  Ms. Johnson.

8         MS. JOHNSON:  No objection.

9         THE COURT:  Exhibit 6 is admitted.

10   Q.   (BY MS. MARSH)  I'd ask my co-counsel to now display for

11   the witness Exhibit 7.

12        Officer Navarro, do you recognize this document?

13   A.   Yes, I do.

14   Q.   And what is it?

15   A.   It's a sworn statement.  It's an I-867A.

16   Q.   And do you recognize the defendant's name again on this

17   document statement by Martin Gutierrez-Barba?

18   A.   Yes, I do.

19   Q.   And do you recognize his A-number ending in 444 on this

20   document as well?

21   A.   Yes, I do.

22   Q.   And when you -- What's the purpose of taking a sworn

23   statement?

24   A.   It's basically to establish what occurred and for us to get

25   his correct name, date of birth, his alienageness or --

1    Q.  Alienage?

2    A.  Yes, where he was born and what country is he a citizen of.

3    Q.  And in taking -- So did you take a sworn statement on this

4    day and prepare this document?

5    A.  Yes, I did.

6           MS. MARSH:  I'd move to admit Exhibit 7 into evidence,

7    Your Honor.

8           THE COURT:  Ms. Johnson.

9           MS. JOHNSON:  No objection.

10          THE COURT:  Exhibit 7 is admitted.

11   Q.  (BY MS. MARSH)  And when you take an individual's sworn

12   statement, do you first give them warnings, Miranda rights?  Do

13   you inform them of their right to not have this interaction

14   with you or engage in a sworn statement?

15   A.  Yes.

16   Q.  And did you do that in this case?

17   A.  Yes.

18   Q.  And did the defendant indicate he was willing to speak with

19   you?

20   A.  Yes, he did.

21   Q.  Did he give you his name?

22   A.  Yes, he did.

23   Q.  Did you ask him his place of birth?

24   A.  Yes, I did.

25   Q.  And what was his response?

1    A.  Mexico.

2    Q.  Specifically looking at the form, did he indicate an area

3    in Mexico?

4    A.  Yes, Uruapan, Michoacan, Mexico.

5    Q.  And did you ask him his country of citizenship?

6    A.  Yes, I did.

7    Q.  And what did he tell you about that?

8    A.  He answered Mexico.

9    Q.  Did you ask him whether he had a claim to citizenship in

10   any other countries?

11   A.  Yes, I did.

12   Q.  What did he say?

13   A.  He answered no.

14   Q.  And specifically did you ask him are you a citizen of the

15   United States of America?

16   A.  Yes.

17   Q.  And what did he say about that?

18   A.  No.

19   Q.  Did you ask him about his parents' citizenship?

20   A.  Yes.

21   Q.  And what did he tell you about that, where his parents

22   citizens of?  Back up.

23        It's about halfway down Page 2 of 5, three-quarters of

24   the way down Page 2 of 5, that's displayed on the screen right

25   now.

1    A.  He answered Mexico.

2    Q.  Thank you.  Did you ask the defendant if he had any -- ever

3    been paroled into the United States?

4    A.  Yes, I did.

5    Q.  Or whether he'd ever legally immigrated into the

6    United States?

7    A.  Yes.

8    Q.  And did you ask him whether he had any petition or

9    application pending for admission to the United States?

10   A.  I don't see it here, but --

11   Q.  I think it's -- Keep going.

12   A.  Yes.

13   Q.  On the last page, yes.

14   A.  Yes.

15   Q.  And what did he say?

16   A.  He answered no.

17   Q.  Thank you.

18           THE COURT:  All right.  I'm going to just instruct

19   counsel just slow down.  You're tending to talk over one

20   another.  And so just, if you could, just keep your cadence

21   slow, that would help us a little bit.  Thank you.

22           MS. MARSH:  Certainly, Your Honor.

23   Q.  (BY MS. MARSH)  And did you review all of the defendant's

24   answers with him after completing this form?

25   A.  Yes, I did.

1    Q.  And did he initial the document to show that you had

2    reviewed this with him?

3    A.  That's correct.

4    Q.  Ask my co-counsel to show the witness Exhibit 8.

5           Officer Navarro, do you recognize this document, Page

6    2 of Exhibit 8?

7    A.  Yes.  This is the I-867 part B.

8    Q.  And is this a continuation of that sworn statement?

9    A.  Yes.  It's the last page of the statement.

10   Q.  And after reviewing everything with the defendant, did he

11   sign this page?

12   A.  Yes, he did.

13   Q.  Do you recognize the defendant's name and A-number on this

14   document?

15   A.  Yes.

16   Q.  I'm sorry.  I'm trying to find the A-number.  His name is

17   on the document, the defendant's name, Martin Gutierrez-Barba,

18   correct?

19   A.  Yes, his name.

20          MS. MARSH:  I'd move to admit Exhibit 8 as well.

21          THE COURT:  Exhibit 8 is admitted.

22   Q.  (BY MS. MARSH)  May I ask my co-counsel to show the witness

23   Exhibit 10.

24          And do you recognize what this document is, Exhibit

25   10?

1    A.   Yeah.   It's an I-860.

2    Q.   And what is that?

3    A.   It's a notice and order of expedited removal.

4    Q.   And do you recognize the defendant's name, Martin

5    Gutierrez-Barba, and A-number ending 444 in this document?

6    A.   Yes, I do.

7    Q.   Is this the document that you prepared on October 7th of

8    2009?

9    A.   Yes, I did.

10   Q.   And what is the effect of this form?

11   A.   This is the determination of inadmissibility, so it states

12   the charges against -- against the individual.

13   Q.   And when this form is fully completed, is it the order that

14   he is removable?

15   A.   Yes, this is the order, yes.

16   Q.   And is it completed by individuals up your chain?   The

17   additional signatures, are those your supervisor and chief?

18   A.   That's correct.

19   Q.   And then is that your signature on the certificate of

20   service form on the very bottom part of the form?

21   A.   Yes, it is.

22          MS. MARSH:   I'd move to admit Exhibit 10.

23          THE COURT:   Ms. Johnson.

24          MS. JOHNSON:   No objection.

25          THE COURT:   Exhibit 10 is admitted.

1            MS. MARSH:  May I have one moment, Your Honor?

2            THE COURT:  Yes.

3            MS. MARSH:  Does the Court have any questions for this

4    witness?

5            THE COURT:  I do not.

6            MS. MARSH:  I have no further questions.

7            THE COURT:  All right.  Sir, you may step down.

8            Ms. Marsh, Ms. Kennedy, let me just ask you just to

9    try not to lead your witness and speak a little slower, slowly.

10   It's a chore to keep up with.  You both have very quick

11   cadence.  And so -- Just give your witness a moment to examine

12   the exhibit.  You're moving very, very rapidly, and you don't

13   need to do that.  So -- All right.  Sir, who is this next

14   witness?

15           MS. MARSH:  United States calls Border Patrol

16   Agent Michael Arguelles.

17           THE COURT:  All right.  Sir, please come forward and

18   be sworn.

19       MICHAEL ARGUELLES, GOVERNMENT'S WITNESS, SWORN

20           MS. MARSH:  May I proceed, Your Honor?

21           THE COURT:  You may.

22                      DIRECT EXAMINATION

23   BY MS. MARSH:

24   Q.  Agent Arguelles, where do you work?

25   A.  I work with the U.S. Border Patrol down in Nogales,

1    Arizona.

2    Q.  And how long have you been a Border Patrol agent?

3    A.  Just over 13 years.

4    Q.  Can everyone hear him okay?

5             THE COURT:  If you can just keep that microphone up,

6    that would help.  Yes.  Thank you.

7    Q.  (BY MS. MARSH)  And what training did you receive to become

8    a Border Patrol agent?

9    A.  I did a five-month academy located in Artesia, New Mexico.

10   That's the basic border patrol agent training facility.

11   Q.  Did that academy include training in processing individuals

12   using immigration documents?

13   A.  Correct.  They specifically give us training on immigration

14   law.

15   Q.  So on immigration law and also in all of the regulations

16   surrounding the forms that need to be completed?

17   A.  Correct.

18   Q.  I'm going to ask my co-counsel to show you Exhibit 1.  And,

19   Agent Arguelles, do you recognize what this document is?

20   A.  I do.

21   Q.  What is it?

22   A.  It's, specifically, it's an I-296, and it's a notice to the

23   aliens that are -- be ordered removed and departure

24   verification as well at the bottom.  It's kind of like a

25   two-part form.

1    Q.  And did you review this form or this document in

2    preparation for coming to court today?

3    A.  I did.  I reviewed this a few days ago.

4    Q.  And do you recognize the defendant's name, Martin

5    Gutierrez-Barba, on that top line, alien's full name?

6    A.  I recognize it because I reviewed it a few days ago.

7    Q.  Right.  And do you recognize his A-number ending in 444 in

8    the file number?

9    A.  Correct, on the top right of the form.

10   Q.  And based on your training and experience, what does that

11   mean, that a certain individual's name and A-file number are on

12   a document?

13   A.  It's kind of like their, within the immigration system,

14   it's like their, if you would, like their social security

15   number.  It's like their identification number.  Once they are

16   assigned an A-number or file number, that should be with them

17   permanently.

18   Q.  And do you recognize your name on the bottom portion of the

19   form in the verification of removal section?

20   A.  I do.  That is my signature where it says signature of

21   verifying officer.

22   Q.  And on that same -- Your Honor, actually I would move to

23   admit Exhibit 1 at this time.

24          THE COURT:  Yes.  Exhibit 1 -- Let me just double

25   check with Ms. Johnson.

1        MS. JOHNSON:  No objection.

2        THE COURT:  Exhibit 1 is admitted.

3   Q.  (BY MS. MARSH)  Do you recognize the departure date,

4   December 18th of 2009, or do you see that on Exhibit 1?

5   A.  Correct.  I recognize the date from when I reviewed it a

6   few days ago.

7   Q.  And were you working on that date?

8   A.  Yes.  According to this form, that's my signature.  If I

9   signed that and it's dated there, I was working on that date.

10  Q.  Do you have an independent recollection of working back

11  on -- completing a verification of removal back in 2009?

12  A.  Yes.  So, you know, it was some time ago, well over ten

13  years ago.  I don't really remember the specifics, but I know

14  if I was assigned anywhere close to port of entry when there is

15  aliens that are being ordered removed, they will call somebody

16  who has been working that area, someone such as myself, to

17  verify the removals.

18  Q.  And based on your review of this form, did you verify the

19  removal of Martin Gutierrez-Barba on December 18th of 2009?

20  A.  Yes.  It's expected that we verify.  In this particular

21  case, they provide a photo of the individual.  Also I will

22  conduct a roll call.  So I will ask for the -- I will call out

23  someone's name, and that person will identify themselves.

24  Q.  So can you just generally, I guess, explain the process

25  that you would have followed on December 18th of 2009 when

1    verifying the defendant's removal.

2    A.  Correct.  Not too much has changed.

3            Typically, as I previously stated, dispatch will

4    notify us that there is a vehicle containing aliens that are to

5    be removed, sometimes a 15-passenger van up to a bus full of

6    aliens.

7            I will meet them there, right at the port of entry at

8    the vehicle exit portion.  I will verify everybody that is in

9    the vehicle versus the document.  Once I'm satisfied with that,

10   then I will step outside the vehicle, and there's a little box.

11   I hit a button.  And that sends like a radio message to the

12   Mexican authorities across the border.  They will come and meet

13   me at actually right at the border.  And then I will have the

14   aliens gather their belongings, and they will -- we will greet

15   the Mexican authorities.

16           At that point they will -- they will actually verify

17   themselves that, for one, they are who they say they are, and,

18   more importantly, they verify that they're actually Mexican

19   citizens.

20   Q.  Who does that?  The Mexican authorities verify?

21   A.  Correct, correct.

22   Q.  And do you watch the individuals that you're verifying walk

23   across the border?

24   A.  Correct.  And then I close the gate after they leave, the

25   vehicle gate.

1    Q.  And what do the other boxes in this verification of removal

2    form indicate?  We talked about the date already.  When you

3    look at the middle box, what does that indicate?

4    A.  I'm sorry.  You're saying the port of departure?

5    Q.  Correct.

6    A.  Yeah.  So that is -- These particular, just to be specific,

7    the departure, port of departure, manner of departure was

8    pre-filled out by an individual doing the processing because

9    they know exactly where they're going to be.  And just for

10   accuracy purposes, Nogales port of entry, the specific name,

11   that is correct, it is Nogales port of entry, but the specific

12   name is DeConcini Port of Entry.

13   Q.  Okay.  So as this form is completed, does the handwritten

14   in Nogales POE indicate that's where the removal happened?

15   A.  Correct.  That's the only place I've ever conducted a

16   removal, was at that port of entry.

17   Q.  And what does the box manner of departure indicate?

18   A.  It just -- It just basically is real specific on how the

19   alien departed.  In this case, like most, he walked across the

20   border afoot -- on foot.

21   Q.  And then the form also includes a photograph.  In your

22   experience, do you use the photograph to assist in your

23   verification that the correct person is being removed?

24   A.  Correct.

25   Q.  How so?

1    A.  I would just -- It would be expected of me to look at the

2    photo, look at the person, and see if it lines up.

3            They are verified by numerous agents before they even

4    come to my location, but, yes, it is my responsibility to do

5    that as well.

6    Q.  To verify using the photo?

7    A.  Correct.

8    Q.  And then how about the fingerprint?  Who prepares the

9    fingerprint portion of this form?

10   A.  So this was done by another Border Patrol agent at a

11   processing facility.  I have done these type of files in the

12   past as well.  But on that day I was not assigned that duty, so

13   it was not me, so it had to be done by another -- an official

14   that's authorized to do that.

15   Q.  And is there another person's signature on that signature

16   of official taking fingerprint line?

17   A.  Correct.  It is not my signature.

18           THE COURT:  And, again, can you just pull that

19   microphone up to you closer.  Thank you.

20           THE WITNESS:  I'm sorry.  Is this better, Your Honor?

21           THE COURT:  Yes.

22           THE WITNESS:  Okay.  So that had to be somebody else's

23   signature.  That's not mine.  So I assume that's done by an

24   authorized official.

25           MS. MARSH:  So was that prepared ahead of time and

1    then given to you for you to fill in your verification section?

2    A.   That is correct.

3    Q.   So ultimately does this form indicate that you removed

4    Martin Gutierrez-Barba from the United States on December 18th

5    of 2009?

6    A.   That is correct.

7              MS. MARSH:  I have no further questions.  Does the

8    Court have any questions for this witness?

9              THE COURT:  Ms. Johnson.

10             MS. JOHNSON:  No, Your Honor.

11             THE COURT:  Let me see if I understand this correctly,

12   because, sir, in this -- the page that was just on the screen

13   that we were just looking at with your portion filled out --

14             MS. MARSH:  We're pulling it back up, Your Honor.

15             THE WITNESS:  I'm sorry, Your Honor?

16             THE COURT:  Yes.  We're waiting for the document to be

17   pulled up.

18             MS. KENNEDY:  I apologize, Your Honor.

19             THE COURT:  All right.

20             So on this particular page I notice that the first

21   portion above verification of removal line, that portion is not

22   filled out.

23             THE WITNESS:  Oh, yes, right here, signature of

24   officer serving warning, Your Honor.  Okay.  I see that.

25             THE COURT:  And so -- But I also noted that a

1    previously admitted exhibit, Exhibit No. 6, has that line

2    filled out.  The date on both of these exhibits appears to be

3    the same, October 7, 2009.  So I'm just wondering is this a

4    different form, Exhibit No. 1?

5            So I guess my question is:  I'm a bit confused as to

6    why there are two forms, Exhibit No. 1, where there is no

7    signing officer.  It appears to be the same form that was used.

8    But on Exhibit No. 6 it is signed by Officer Navarro, and his

9    name is typed in.

10           MS. MARSH:  Your Honor, I'm not sure this witness is

11   the -- We can inquire of him if he can explain to the Court,

12   but we have subsequent witnesses who can explain as well.  But

13   I can certainly inquire.

14           THE COURT:  Well, yes, if you could show him

15   Exhibit No. 6.

16           MS. MARSH:  Sure.

17           THE COURT:  And maybe that will make sense.  I'm just

18   confused as to how these -- if they relate to one another, or

19   maybe they overlap, or --

20   Q.  (BY MS. MARSH)  So you're being shown now Exhibit 6, which

21   is -- I mean, go ahead and look at Exhibit 6 and tell me if you

22   recognize this form as well.

23   A.  That is correct.  So Exhibit 6 is the same form as the

24   exhibit where you see my signature as well.

25           So I think what happened here is the processing agent

1   explained to the alien what was to happen at the detention

2   facility and for various reasons just printed off another form,

3   and that is what I had to work with when I received it that

4   day.

5          So I'm -- I don't want to say assume.  That's the

6   wrong word.  But there's a good chance this was in conjunction,

7   so we might have two of these forms in the same file.

8   Q.  And in your training and experience, have you observed two

9   of the same form in an A-file in preparation for certain

10  actions?

11  A.  I recall, like a lot of times, you have to make multiple,

12  multiple copies of, like, one particular form.

13         MS. MARSH:  Does that help the Court?  There are

14  subsequent witnesses who can address this as well.

15         THE COURT:  All right.  No.  That answers my question,

16  sir.  Thank you.

17         THE WITNESS:  Okay.  Thank you, Your Honor.

18         MS. MARSH:  I have nothing further.

19         THE COURT:  All right, sir.  Thank you.  You may step

20  down.

21         All right.  Counsel, why don't we take about a

22  15-minute break, and then we can resume.

23         MS. MARSH:  Thank you, Your Honor.

24      (Proceedings recessed from 10:17 a.m. until 10:34 a.m.)

25         THE COURT:  You may call your next witness.

DOUGLAS - DIRECT

1      MS. MARSH:  The government calls Starr Douglas.

2      THE COURT:  Please come forward and be sworn.

3      STARR DOUGLAS, GOVERNMENT'S WITNESS, SWORN

4      MS. MARSH:  May I inquire, Your Honor?

5      THE COURT:  You may.

6                       DIRECT EXAMINATION

7   BY MS. MARSH:

8   Q.  Ms. Douglas, can you please tell us what you do for work.

9   A.  I'm a fingerprint specialist with Customs Border Protection

10  through the Laboratory Scientific Services Division.

11  Q.  And what does a fingerprint specialist do?

12  A.  There's several different things a fingerprint specialist

13  can do.  Process evidence that's brought in by different law

14  enforcement agencies.  I also do comparisons of fingerprints,

15  latents or known.

16  Q.  And how long have you been a fingerprint specialist?

17  A.  I've been doing fingerprints for 11 years.

18  Q.  And prior to your role as a fingerprint specialist, did you

19  receive any specific training in the field of fingerprinting or

20  forensics generally?

21  A.  I did.  I started my forensic career in 1996 in their

22  controlled substance unit with some state governments.  In 2010

23  I was cross-trained in fingerprinting where I went through a

24  year and a half training program with the Arizona Department of

25  Public Safety.  That training consisted of learning how to

UNITED STATES DISTRICT COURT

1   process different types of evidence, different surfaces, being

2   able to do comparisons of fingerprints, known and latents, also

3   doing searches in unknown databases to try and identify an

4   unknown print.

5   Q.   Did you also have additional education prior to that

6   specialized training in fingerprints?

7   A.   I did.

8   Q.   What was your -- What is your additional education?

9   A.   I have a bachelor of science degree in biology from the

10  University of Illinois at Urbana-Champaign.

11  Q.   So what's your total number of years working in forensic

12  analysis?

13  A.   Just over 24.

14  Q.   And do you hold any certifications specific to fingerprint

15  analysis?

16  A.   I do.  Through an organization called the IAI -- it's the

17  International Association for Identification -- they have a

18  certification for latent print examiners, which is considered a

19  certified latent print examiner exam.

20  Q.   And have you testified as an expert previously?

21  A.   I have.

22  Q.   In what courts?

23  A.   I, through my years of doing courtroom testimony, I have

24  testified in Illinois state and county courts.  Here in Arizona

25  I've been through city, county, state, Indian reservations, and

1    federal.

2    Q.   How many times would you estimate you've testified as an

3    expert?

4    A.   Through my whole career, probably close to 150 -- 80 times.

5    Q.   Are you a member of any professional organizations related

6    to the science of fingerprint analysis?

7    A.   I am.  I belong to two different organizations.  One is the

8    IAI, which I previously mentioned, and then the other one is

9    AIC, which is the Arizona Identification Council, and it's put

10   together examiners here in Arizona.

11   Q.   I'd like to turn your attention to sort of the science of

12   fingerprinting.  Are fingerprints unique to each individual?

13   A.   Yes, they are.

14   Q.   And how does that matter in your profession?

15   A.   Well, essentially my profession wouldn't exist if they

16   didn't.  The basis for them to be unique to each individual is

17   kind of how they're developed in womb, and for that it gives us

18   specific identification to each individual being able to use

19   their ridge detail.

20   Q.   And what's the difference between a record fingerprint and

21   a latent fingerprint?  You've mentioned both of those in sort

22   of your training background.

23   A.   A record fingerprint is a printing of the ridge detail from

24   either the palms or the bottom of one's foot taken in a

25   controlled environment typically for recording purposes.

1            A latent fingerprint is one that is left by chance or

2   by accident possibly.  It may be seen or unseen when something

3   is touched.

4   Q.  And what methodology do you use to compare fingerprints?

5   A.  It would be considered -- I go through an analysis,

6   comparison and evaluation, and then also a verification.

7   Q.  What are you -- What are each of those steps doing?

8   A.  Through the analysis phase, I will get, whether record or

9   latent, to determine its value.  Does it have enough

10  information in that print to do a comparison to that?

11           If a comparison is warranted, I then will put that

12  unknown print that I'm trying to ID up to a known record print

13  of an individual.

14           You then do a comparison of that print.  An

15  identification -- or an evaluation can be three different

16  categories.  I can either identify the print as being made from

17  the same -- from that person.  I can exclude that person from

18  making that print.  Or I could actually deem it as

19  inconclusive, meaning there just wasn't enough information in

20  either the record print or the latent print to determine

21  whether it was ID or exclusion.

22  Q.  And were you asked to analyze fingerprints in this case?

23  A.  I was.

24  Q.  What methodology did you use?

25  A.  That same method.

1   Q.  Were you given -- How many different types of prints were

2   you given?

3   A.  I received four different documents.

4   Q.  And did each of those documents, what type of print did

5   those documents contain?

6   A.  Record fingerprints.

7   Q.  Were all of those documents that you were provided part of

8   an individual's A-file?

9   A.  I believe so, yes.

10  Q.  Did each of those documents, I guess, contain an

11  individual's name and a number?  I'll show you the actual

12  exhibits in a moment.  But did they also associate to the same

13  name and A-file number?

14  A.  I believe so.  The name for sure.  I don't take a close

15  look at the A-file number.  It typically what we would call an

16  FBI number that's on the record card, on the name or the date

17  that's being referenced to the document or the form that was

18  being used.

19  Q.  And what name did those documents associate with?  Was it

20  Martin Gutierrez-Barba?

21  A.  Yes, it was.

22  Q.  I'm sorry.  Did you prepare a report in this case?

23  A.  I did.

24  Q.  And did you provide that to the government and by extension

25  defense counsel?

1    A.  I did.

2    Q.  I'm going to show you what's been previously marked as

3    Exhibit 5 on the -- using the overhead projector.  Is this your

4    report?

5    A.  Yes, it is.

6    Q.  And do you recognize -- I guess how do you know it's your

7    report?

8    A.  If you scroll to the bottom, my name will be on the bottom

9    of the report, but I also recognize the lab report number --

10   Q.  Okay.

11   A.  -- on the --

12   Q.  I'm sorry.  On the second page, does it have your name as

13   the analyst?

14   A.  It does.

15   Q.  And on the first page of Exhibit 5, what else did you

16   recognize?

17   A.  The lab report number, which is in the upper left corner as

18   HT20211601.

19   Q.  And does this report reference the four different exhibits

20   that you examined?

21   A.  Yes, it does.

22   Q.  And were those exhibit -- Are they listed here?

23   A.  Yes, they are.

24   Q.  Okay.  And do each of those exhibits reference back to the

25   defendant, Martin Gutierrez-Barba?

1    A.  Yes, they do.

2    Q.  And did you reach a conclusion that you documented in this

3    report?

4    A.  I did.

5    Q.  What was your conclusion?

6    A.  That they were all identified to the same individual.

7             MS. MARSH:  I'm now going to ask --

8             I move to admit Exhibit 5.

9             THE COURT:  Exhibit 5 may be admitted.  Let me -- I'm

10   sorry.  Ms. Johnson, did you have an objection?

11            MS. JOHNSON:  No objection.

12            THE COURT:  Exhibit 5 may be admitted.

13   Q.  (BY MS. MARSH)  I'm going to now ask my co-counsel to show

14   you first Exhibit 1, Page 2.  The exhibit numbers that are

15   listed in your report also refer to this document as Exhibit 1,

16   but for purposes of our trial, this is also marked Exhibit 1.

17            Do you recognize this document?

18   A.  I do.

19   Q.  Was it one of the documents that was provided to you to

20   conduct a comparison of a record fingerprint?

21   A.  It was.

22   Q.  And can you see the fingerprint here that you used for that

23   comparison?

24   A.  Yes, I can.

25   Q.  I will now show you Exhibit 2, Page 2.  Do you recognize

1    Exhibit 2?

2    A.  I do.

3    Q.  And is this one of the documents that you were provided in

4    order to conduct your comparison?

5    A.  Yes, I was.

6    Q.  And this document has many fingerprints.  Does that make a

7    difference to you?

8    A.  It does not.

9    Q.  Which print do you actually compare?

10   A.  For a record similar case to this, I look to see which

11   finger I need to compare based on other documents.  This is

12   known as a tenprint card, which should contain all ten of the

13   fingers.  So it's the right hand is on the top row rolled, then

14   the left hand, and then it's simultaneous, like, flat

15   impression prints at the bottom.

16   Q.  And can you scroll to Page 2 of this document as well or

17   Page 3.

18          And does the document, this document in particular,

19   indicate when these prints were prepared?

20   A.  It does have a date at the top, yes.

21   Q.  And what is it?

22   A.  2009, 10-07.

23   Q.  Okay.  And -- I'm sorry -- I skipped that question on

24   Exhibit 1.  Did that document also indicate the date that

25   those -- that that print, that single print, was rolled or

1    prepared?

2    A.  Yes, it does.

3    Q.  And what date was that fingerprint rolled?  Can you tell

4    from -- Well, let me just ask you what date was that

5    fingerprint prepared?

6    A.  The date at the top of the page, which is the one I used,

7    is 10-07-2009.

8    Q.  When you look at this document, is there a different date

9    on this page as well?

10   A.  There is.

11   Q.  And is that date December 18th of 2009?

12   A.  Yes, it is.

13   Q.  And is that in that lower portion next to the fingerprint?

14   A.  Yes, it is.

15   Q.  And I'd now like to show you Exhibit 3 --

16           THE COURT:  Before you go to that, I wanted to get her

17   to answer your question with regard to Exhibit 2.  Which finger

18   did you use to compare?

19           THE WITNESS:  It would have been the right index or

20   the number two finger.

21   Q.  (BY MS. MARSH)  And why is that again?

22   A.  That was the fingerprint that was found on the other two

23   forms that I compared, I believe Exhibit 1 and 3.

24   Q.  Thank you.  Can we now show Exhibit 3.  And on this

25   exhibit, do you see the fingerprints you used for the

58

1    comparison?

2    A.  I do.

3    Q.  And from your review of the exhibit, can you tell what date

4    these fingerprints were taken or prepared?

5    A.  I believe it's September 28th of 2019.

6    Q.  And on this --

7    A.  Did I say December?  I meant September -- sorry -- '09.

8    Q.  September 28th, 2019?

9    A.  Correct.

10   Q.  And do you see that on the form itself?

11   A.  I do.

12   Q.  Okay.  Is that -- Where on the document do you see that

13   date?

14   A.  It's actually in two different areas.  There's one towards

15   the top of the page, mid -- that's the date of action -- and

16   then there's also one at the very bottom of the page on the

17   right-hand side.

18   Q.  And this document contains two different fingerprints.

19   Which fingerprint did you compare on this document?

20   A.  I used the right index finger as well.

21   Q.  And now I'd like to show you Exhibit 4.  And is this the

22   fourth document you were provided to conduct your fingerprint

23   comparison?

24   A.  Yes, it was.

25   Q.  And does this document on the third page of the exhibit,

1   the second page of the document itself, contain a date that

2   this -- these fingerprints were taken?

3   A.   It does.

4   Q.   And what is that date?

5   A.   It's September 28th, '19.

6   Q.   And are these fingerprint cards -- there are two of them in

7   this case, the tenprint cards -- are those commonly prepared in

8   immigration cases?

9   A.   Yes, they are.

10  Q.   Based on your training and experience?

11  A.   Correct.

12  Q.   I do want to go back and ask you a follow-up question about

13  your report, Exhibit 5.  There is a number referenced on your

14  report.

15          May I go back to the Elmo, please, Liliana.

16          There is an ID number contained on your report that is

17  different from the A-file numbers referenced in the other

18  exhibits.  Can you -- Did you research why that is the case?

19  A.   I did.  When I use an ID number on any report, it's based

20  off of the request form that I receive from the submitting

21  agency.  And we ensure during our tech review and admin review

22  that that investigative number or ID number submitted by the

23  request form from the agency actually goes onto the report.

24  Q.   So does that number influence your actual comparison in any

25  way?

1    A.  No, it does not.

2    Q.  And the comparisons you made, were they, as you've already

3    described, to the documents that you've already reviewed for

4    the Court?

5    A.  Yes, they were.

6           MS. MARSH:  I have no further questions.

7           THE COURT:  Ms. Johnson.

8           MS. JOHNSON:  No questions.

9           THE COURT:  Let me see if I understand your testimony.

10                          EXAMINATION

11   BY THE COURT:

12   Q.  Essentially the crux of your testimony is that you compared

13   these four print cards that were in the A-file one to another?

14   A.  Correct.

15   Q.  And you didn't have a separate set of fingerprints that

16   were provided to you from which to compare them to?  You were

17   just asked to make sure or to see if all of those fingerprints

18   were of the same individual?

19   A.  Correct.

20           THE COURT:  All right.  Thank you.  You may step down.

21           And you may call your next witness.

22           MS. KENNEDY:  Your Honor, the government calls our

23   final witness, deportation officer James Joyner.

24           THE WITNESS:  Am I free to leave?

25           THE COURT:  Yes, you are free to go.

1          MS. KENNEDY:  Your Honor, before Officer Joyner steps

2     up, we just wanted to follow up with the Court about the motion

3     from this morning.

4          THE COURT:  Ms. Johnson.

5          MS. JOHNSON:  Your Honor, if Mr. Joyner -- It's a

6     little unclear to me the entire scope of his testimony.  As I

7     understand it, he's just going to testify that he looked

8     through the A-file and pulled out some documents and gave them

9     to the government.  If that's all he's testifying about, I

10    don't see the relevance of the information contained in the

11    motion.

12         THE COURT:  And Ms. Johnson does make a valid point.

13    In reading the motion -- I had a brief time to do that during

14    our break -- if that is indeed the sum and substance of his

15    testimony, then I don't know the relevance of the motion.  And

16    certainly if he testifies differently, then and if I find a

17    necessity to rule, then I can rule.  But otherwise I don't -- I

18    don't think that -- I don't need to at this point.

19         MS. KENNEDY:  Just to clarify for the record, Your

20    Honor, and so Ms. Johnson is aware, it's correct that we will

21    be having Officer Joyner testify to specific documents he

22    pulled from the A-file, also to the absence of certain

23    documents that may not have been found in the A-file, and then

24    obviously the public records.  But that is the sum of his

25    testimony.

1          JAMES JOYNER, GOVERNMENT'S WITNESS, SWORN

2          THE COURT:  Would you test it out.

3          THE WITNESS:  Can you hear me?

4          THE COURT:  I can't.

5          THE WITNESS:  Can you hear me?

6          THE COURT:  No.  Now I hear -- Now I hear.

7          THE WITNESS:  I can hold it like this if that's fine.

8          THE COURT:  That would work.  Thank you.

9                         DIRECT EXAMINATION

10  BY MS. KENNEDY:

11  Q.  Good morning, Officer Joyner.  Please state and spell your

12  name for the record.

13  A.  My name's James Joyner, J-a-m-e-s J-o-y-n-e-r.

14  Q.  Where do you work?

15  A.  I work for Immigrations and Customs Enforcement in Phoenix,

16  Arizona.

17  Q.  And do you work for a specific part of Immigration and

18  Customs Enforcement?

19  A.  Yes.  I work for an enforcement and removal operations

20  criminal prosecutions unit.

21  Q.  How long have you worked for the enforcement and removal

22  operations component or ERO?

23  A.  12 years.

24  Q.  What is your current assignment?

25  A.  My current assignment is with the prosecutions unit.

1   Q.  How long have you been in that position?

2   A.  I've been in this position for the last two and a half

3   years.

4   Q.  Please provide the Court a thumbnail description of your

5   involvement in this case.

6   A.  I reviewed the A-file and all the documents contained

7   within it.

8   Q.  How long have you worked in law enforcement?

9   A.  Approximately 14 years.

10  Q.  At ICE did you go through any specialized training?

11  A.  Yes.  I completed the fed -- basic law enforcement training

12  program in Glynco, Georgia, that was approximately 21 weeks.

13  Q.  Did you go through any training specific to immigration

14  law?

15  A.  Yes.  That was the majority of the training that we did,

16  was focused on immigration law, criminal investigations, some

17  physical training.  And then I believe there was a five-week

18  Spanish language program training course.

19  Q.  During that training did you also learn about the different

20  documents that you would find in an A-file?

21  A.  Yes, I did.

22  Q.  What is an A-file?

23  A.  An A-file is the physical record of an alien's immigration

24  history.

25  Q.  Is an A-file identified by a unique number?

1    A.   Yes, it is.

2    Q.   What is that number called?

3    A.   It is called an A-number.

4    Q.   Is every A-number unique to an individual person?

5    A.   Yes, it is.

6    Q.   What sort of documents go into an A-file?

7    A.   Agency records checks, any record or application for

8    admission to the United States, any kind of criminal background

9    checks, as well as any encounter documents that the agency has

10   acquired.

11   Q.   When you say encounter documents, does that include all

12   contacts that person had with immigration authorities?

13   A.   Yes, that's what it is.

14   Q.   Where are A-files stored?

15   A.   A-files are stored at the National Records Center.

16   Q.   Who maintains the A-file?

17   A.   Citizenship and Immigration Services maintains the A-file,

18   whereas ICE will custody the A-file when it's needed in the

19   field.

20   Q.   And just to clarify for the record, Citizenship and

21   Immigration Services is part of the Department of Homeland

22   Security?

23   A.   Yes, it is.

24   Q.   Who has access to the A-files?

25   A.   Department of Homeland Security, our government employees.

1    Q.  Who has permission to add to the A-file?

2    A.  Those employees of the Department of Homeland Security and

3    Citizen Immigration Services, ICE, Customs and Border

4    Protection, as well as Border Patrol.

5    Q.  Is DHS a public agency?

6    A.  Yes, it is.

7    Q.  Broadly speaking, what is DHS's public function with

8    respect to immigration?

9    A.  To provide -- We execute the immigration law as it relates

10   to --

11           THE COURT:  Bring up the microphone again.

12           THE WITNESS:  I'm sorry.

13           THE COURT:  You're starting to drop in volume.  Thank

14   you.

15           THE WITNESS:  Could you repeat that question again.

16   Q.  (BY MS. KENNEDY)  Sure.  Broadly speaking, what is DHS's

17   public function with respect to immigration?

18   A.  We carry out immigration law.

19   Q.  So is it fair to say it's to enforce the immigration laws

20   of the United States?

21   A.  Yes, it is.

22   Q.  Is an A-file maintained by Department of Homeland Security

23   to help the agency perform its public function?

24   A.  Yes, it is.

25   Q.  Do the A-file documents relate to information by activities

1    reported by or things observed by DHS employees pursuant to

2    their legally imposed duties?

3    A.   Yes, they do.

4    Q.   Is it important for DHS that the records maintained in the

5    A-file be accurate?

6    A.   Yes, it is.

7    Q.   Why?

8    A.   So that we can perform our job functions accurately.

9    Q.   So now we're going to turn to the defendant in this case,

10   Mr. Martin Gutierrez-Barba.  Does he have an A-file?

11   A.   Yes, he does.

12   Q.   Is there an alien number or administrative number

13   associated with that A-file?

14   A.   Yes, there is.

15   Q.   And that number is unique to Mr. Martin Gutierrez-Barba?

16   A.   Yes, it is.

17   Q.   Does his nine digit number end in 444?

18   A.   Yes, it does.

19   Q.   Have you reviewed the A-file for Mr. Gutierrez-Barba?

20   A.   Yes, I have.

21   Q.   Did you find documents related to this matter?

22   A.   Yes, I have.

23   Q.   As part of this case, did you submit documents to a

24   fingerprint expert who you previously saw testify?

25   A.   Yes, I did.

1    Q.  In preparation for trial, did you notice an error in your

2    submission request?

3    A.  Yes, I did.

4    Q.  What was the error?

5    A.  The error was I input the -- an incorrect A-number on the

6    request form that I submitted to the fingerprint specialist.

7    Q.  But were the docs you actually provided to the fingerprint

8    specialist for comparison from the A-number associated with

9    Mr. Gutierrez-Barba ending in 444?

10   A.  Yes, they were.

11         MS. KENNEDY:  I'm now going to turn to Exhibit 12,

12   Your Honor.  Permission to display what's been previously

13   marked for identification as Exhibit 12.

14         THE COURT:  Yes, you may.

15         MS. KENNEDY:  Thank you.

16   Q.  (BY MS. KENNEDY)  Officer Joyner, do you recognize Exhibit

17   12?

18   A.  Yes.  It's the I-294 warning to alien removed or deported.

19   Q.  Is this a certified copy of an original document from

20   Mr. Gutierrez-Barba's A-file?

21   A.  Yes, it is.

22   Q.  What agency certified these documents?

23   A.  Citizenship and Immigration Services.

24   Q.  Does this document specifically pertain to

25   Mr. Gutierrez-Barba?

1    A.  Yes, it does.

2    Q.  Does this document contain a unique A-number?

3    A.  Yes, it does.

4         MS. KENNEDY:  Your Honor, at this time I move to admit

5    Exhibit 12 into evidence.

6         THE COURT:  It may be admitted.

7    Q.  (BY MS. KENNEDY)  Thank you.

8         Officer Joyner, why does DHS typically issue an I-294

9    to a particular individual?

10   A.  We issue this document to let the alien know what his --

11   how long he's going to be banned for applying to admission to

12   the United States.

13   Q.  And is there a different period of time that might apply to

14   one person versus someone else?

15   A.  Yes, there is.

16   Q.  Why is that?

17   A.  The -- It depends on the different situations under which

18   they were encountered.  So typically if they're ordered removed

19   by an IJ or an immigration judge, that will carry a different

20   period that they're banned from applying for admission to the

21   United States.  If they have reentered the United States

22   illegally after removal, that would indicate a different ban

23   period.  Or if they were apprehended and removed by an

24   immigration official, which would be Customs or Border

25   Protection or Border Patrol, that would hold its own period of

1    time that they were barred from applying to admission to the

2    United States.

3    Q.   If someone's period expires, the period that they would be

4    barred for, does that mean that they can come back without

5    permission?

6    A.   No, it does not.

7    Q.   Does the I-294 say anything about what might happen to an

8    individual if he or she comes back after having been removed?

9    A.   Yes, it does.

10   Q.   What does it say?

11   A.   It explains that they will -- they could face criminal

12   prosecution if they reenter the United States after being

13   removed.

14   Q.   Does it also notify the individual that they need to obtain

15   permission before returning?

16   A.   Yes, it does.

17   Q.   Does this particular I-294 relate to a specific immigration

18   event?

19   A.   Yes, it does.

20   Q.   Which one?

21   A.   His removal on May 24th, 2015.

22   Q.   And that, just to clarify again, the specific I-294 also

23   provided Mr. Gutierrez-Barba with notice as to the consequences

24   should he return?

25   A.   Yes, it does.

1   Q.  Based on your review of the A-file, was this the most

2   recent removal that Mr. Gutierrez-Barba had?

3   A.  Yes.

4           MS. KENNEDY:  Your Honor, permission to display for

5   the witness what's been previously marked for identification as

6   Government Exhibit 13.

7           THE COURT:  Yes.  And try not to lead your witness.

8           MS. KENNEDY:  Understood, Your Honor.

9   Q.  (BY MS. KENNEDY)  Officer Joyner, do you recognize Exhibit

10  13?

11  A.  Yes, I do.

12  Q.  What is it?

13  A.  It is a warning to alien removed or --

14  Q.  I'm sorry.  Would you mind holding up.  We have the wrong

15  exhibit.

16          All right.  Do you recognize Exhibit 13?

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  It is a Form I-205, warrant of removal.

20  Q.  Is this a two-sided document?

21  A.  Yes, it is.

22  Q.  Is this a certified copy of an original document from the

23  defendant's A-file?

24  A.  Yes, it is.

25  Q.  What agency certified these documents?

1   A.   Citizenship and Immigration Services.

2   Q.   Does this document pertain to a particular individual?

3   A.   Yes, it does.

4   Q.   Who?

5   A.   Martin Gutierrez-Barba.

6   Q.   Does this document contain a unique A-number?

7   A.   Yes, it does.

8   Q.   Does that number end in 444?

9   A.   Yes, it does.

10        MS. KENNEDY:  Your Honor, at this time I move to admit

11   Exhibit 13 into evidence.

12        THE COURT:  Ms. Johnson.

13        MS. JOHNSON:  No objection.

14        THE COURT:  It may be admitted.

15        MS. KENNEDY:  Thank you, Your Honor.

16   Q.   (BY MS. KENNEDY)  Officer Joyner, what is the purpose of

17   this Form I-205?

18   A.   It is -- It's the tool used to execute an order of removal.

19   Q.   When you say execute an order of removal, is that for the

20   first time, or can you provide the Court with a little bit more

21   context of when specifically this document would be used in the

22   immigration proceeding?

23   A.   Okay.  In this particular situation, he had already been

24   ordered removed by an immigration official previously.  So we

25   used this document to reinstate that prior order of removal.

1   Q.   Thank you.  You were present in court during the testimony

2   regarding two exhibits specifically.  They were both Forms

3   I-296, Exhibits 1 and 6.

4            And you were present when there was discussion about

5   those being on two of the same form essentially, one half

6   filled out in one exhibit and the other half filled out in the

7   other exhibit.  In your experience, is this common?

8   A.   Yes, it is very common.

9   Q.   Based on your review of the A-file, do you have an

10  explanation for the time lapse in this particular case?

11  A.   I believe he was in the -- being prosecuted at the time.

12  Q.   All right.  Let's turn back to the A-file in this case.

13  Did you review the entire A-file?

14           THE COURT:  Let me ask him one question about Exhibit

15  13.

16           Ms. Kennedy asked you a question about how to use this

17  warrant of removal, this particular exhibit.  And you indicated

18  that it reinstates the original removal order.

19           How do you know that by looking at this document?

20           THE WITNESS:  Because this document itself has to

21  follow some type of removal order.  We can't do anything with

22  it by itself.  It only gets attached to a previous removal

23  order.

24           THE COURT:  And so is there any way on this document

25  to tell which prior removal order it relates to?

1          THE WITNESS:  If I could see the first page -- No, not

2     from this particular document.  But there are supporting

3     documents in the A-file that we have to reference so that we

4     know which removal order to reinstate the current removal.

5          THE COURT:  Okay.  Thank you.

6          MS. KENNEDY:  I'm sorry, Your Honor.  Just to clarify

7     for the record, this particular I-205, we're offering it just

8     to show the last removal and the warnings, but to my

9     knowledge -- and I'll ask Officer Joyner this -- this document

10    was reinstating a different removal order that is not the

11    removal order alleged in the superseding indictment.  So I just

12    wanted to make sure that was clear for the Court.

13    Q.  (BY MS. KENNEDY)  Officer Joyner, based on your review of

14    the A-file, what country is Mr. Gutierrez-Barba a citizen of?

15    A.  A citizen of Mexico.

16    Q.  Did you uncover any information to suggest

17    Mr. Gutierrez-Barba was a naturalized or natural born citizen

18    of the United States?

19    A.  No, I did not.

20    Q.  According to your review of the A-file, was the Department

21    of Homeland Security aware that he had returned to the

22    United States after his last removal in May, 2015, before he

23    was found by immigration authorities on September 27th, 2019?

24    A.  No, we were not.

25    Q.  Based on your review of the A-file, was Mr. Gutierrez-Barba

1   under the constant surveillance of immigration officials from

2   the time he crossed until the time he was found on September

3   27th, 2019?

4   A.  No, he was not.

5   Q.  Did you find anything in the A-file to suggest or show that

6   Mr. Gutierrez-Barba obtained the consent of the Attorney

7   General or the Secretary of the Department of Homeland Security

8   to reapply for admission to the United States?

9   A.  No, I did not.

10          MS. KENNEDY:  I have no further questions, Your Honor,

11  unless the Court has any.

12          THE COURT:  Ms. Johnson.

13          MS. JOHNSON:  No questions.

14                          EXAMINATION

15  BY THE COURT:

16  Q.  I guess let me ask, sir, so it's your testimony that

17  essentially if there's nothing in the A-file between that time

18  period of 2015 to 2019 -- Let me ask it in a different way.

19          If someone had come into contact with

20  Mr. Gutierrez-Barba between that time period, is it your

21  testimony that some notation would occur in the A-file?

22  A.  Yes.

23  Q.  Are you aware of any circumstance where, for example, a law

24  enforcement agency may come into contact with such an

25  individual and it not be included in an A-file?

1    A.   Yes, ma'am.   But that depends on the law enforcement agency

2    that came in contact with him, what they did with him at the

3    time that they encountered him.   I mean, they have no -- Some

4    agencies have no obligation to notify us that he's been in

5    contact.

6              THE COURT:   All right.   And, Ms. Johnson.

7              MS. JOHNSON:   No questions.

8              THE COURT:   All right.

9              MS. KENNEDY:   Your Honor, may I ask one follow-up

10   question?

11             THE COURT:   You may.

12                      REDIRECT EXAMINATION

13   BY MS. KENNEDY:

14   Q.   Officer Joyner, when you said some agencies, some other

15   agencies do not have an obligation to report to you, do the

16   immigration agencies that we previously discussed, do they have

17   an obligation to notate in the A-file when there's been an

18   encounter with a particular individual?

19   A.   Yes, they do.

20             MS. KENNEDY:   No further questions, Your Honor.

21             THE COURT:   All right, sir.   You may step down.

22             THE WITNESS:   Thank you.

23             MS. MARSH:   The government has no further witnesses.

24   We rest at this time.

25             THE COURT:   Well, let me just ask, given the flurry of

1    activity that occurred this morning, I had a recollection that

2    Ms. Johnson indicated that she would stipulate that

3    Mr. Gutierrez-Barba -- there was not an identification issue,

4    and therefore you were not going to put forward an

5    identification witness because I heard none.

6            MS. MARSH:  Correct.  That's based on her stipulation

7    that we agreed to.  If the Court -- If we need to enter a

8    formal stipulation, we should probably do that before we rest I

9    agree.

10           THE COURT:  Let me just confirm that.  Ms. Johnson,

11   was that your stipulation?  That was your intention?

12           MS. JOHNSON:  Yes.

13           THE COURT:  All right.  So Mr. Gutierrez-Barba does

14   not contest that he is the individual that has been testified

15   about and that he is one in the same Martin Gutierrez-Barba.

16           All right.  Ms. Marsh.

17           MS. MARSH:  I think based on that stipulation,

18   specifically that he is the individual who was encountered on

19   each of the occasions that were subject to the testimony, that

20   provides sufficient evidence, given the fingerprint examiner's

21   testimony, that we don't need the fingerprint stipulation as

22   well.  I think that that, as the Court noted, is confusing.

23           So I would also be willing to proceed without that

24   formal stipulation, given his stipulation that he is the

25   individual in each of those exhibits that have been presented

         to the Court.

                 THE COURT:  I think you already entered into the
         stipulation.

                 MS. MARSH:  We did in writing.  I just think that --
         Based on the Court's inquiry this morning, I wasn't sure if the
         Court was satisfied with that stipulation or found it
         confusing.

                 So if the Court would like to proceed based on the
         combination of the testimony and the stipulation, that's fine
         as well.

                 THE COURT:  That's fine.

                 MS. MARSH:  Okay.  Then we have no further witnesses
         based on the stipulation to identity, and we rest.

                 MS. JOHNSON:  Your Honor, and I may just have
         misunderstood Ms. Marsh.  Our stipulation is that any witness
         who testified who encountered Mr. Gutierrez would in fact, you
         know, correctly identify him as the person they had an
         encounter with on that date.

                 There are various encounters here that -- the
         witnesses -- Mr. Gutierrez-Barba is the person who was
         encountered on -- by Phoenix PD on the date in question and
         that any of the individuals who interacted with him would
         correctly identify him as the person they interacted with on
         the date of said interaction with respect to the witnesses who
         testified, yes.

1          THE COURT:  It's a different stipulation.  It's a very

2    different stipulation.  But I'm satisfied that there is at

3    least sufficient testimony and evidence that

4    Mr. Gutierrez-Barba, at least with regard to those four

5    encounters in which he was fingerprinted on those separate

6    occasions, is one in the same.  And I think that's what I

7    heard.  That's the testimony and the evidence that I recall.

8          All right.  Do you have -- Do you wish to make a

9    closing statement?

10          MS. KENNEDY:  Yes, Your Honor.

11          THE COURT:  All right.  You may proceed.

12          MS. KENNEDY:  Your Honor, the defendant Martin

13   Gutierrez-Barba is guilty of violating 8 United States Code

14   Section 1326(a).  On September 27th, 2019, he was found near

15   Phoenix in the District of Arizona after having been previously

16   removed from the United States through Nogales, Arizona, on

17   December 18th, 2009.

18          He did not have the consent of the United States

19   Government, including the Attorney General and the Secretary

20   for the Department of Homeland Security, to reapply for

21   admission to coming back.

22          The Court heard from six government witnesses who

23   testified to the following:

24          First, Phoenix police officer Justin Kraft testified

25   that he found the defendant on September 27th, 2019, and that

1   the defendant underwent an immigration inspection during

2   booking.

3           Second, the Court heard from ICE Deportation Officer

4   Ryan Moulton who, testified how he processed

5   Mr. Gutierrez-Barba when he arrived at the ICE ERO office on

6   September 28th, 2019.

7           Officer Moulton confirmed the defendant's identity and

8   matched him to his prior immigration history.

9           Officer Moulton filled out the Form I-213, Record of

10  Deportable/Inadmissible Alien, the first page of which is

11  Exhibit 3.  That first page contains the defendant's

12  biographical information and his index fingerprints.

13  Officer Moulton also completed the FD-249 fingerprint card for

14  the defendant located on Exhibit 4.

15          Third, the Court heard from United States Customs and

16  Border Protection Officer Juan Navarro, who testified about the

17  defendant's October 7th, 2009, expedited removal order and the

18  defendant's sworn statement acknowledging he is not a U.S.

19  citizen.

20          The Court received Exhibit 2 as the fingerprint card

21  Officer Navarro took on October 7, 2009.  Exhibit 6 is the

22  I-296 notice to alien ordered removed that was also completed

23  on that same date by Officer Navarro.

24          That form provided notice to the defendant that he

25  needed permission from the United States Government to return

1    to the United States.

2         And it also shows that he was warned of the potential

3    consequences including prosecution under 8 U.S. Code Section

4    1326 should he reenter without permission.

5         Exhibits 7 and 8 are the form I-867, parts A and B,

6    the sworn statement and accompanying jurat, that

7    Officer Navarro conducted with the defendant on October 7,

8    2009.

9         In that sworn statement under oath the defendant

10   admitted he is a citizen of Mexico.  He did not have any legal

11   claim to be in the United States.  And he did not have

12   permission to be in the United States.

13        The Court also has Exhibit 10, the Form I-860, the

14   actual removal order showing that the defendant was ordered

15   removed by an immigration official on October 7th, 2009.

16        Fourth, the Court heard from Border Patrol agent

17   Michael Arguelles, who testified about the defendant's actual

18   removal from the United States on December 18th, 2009.  Exhibit

19   1 is another copy of that Form I-296, the departure

20   verification, showing that Border Patrol Agent Arguelles took

21   the defendant's -- verified the defendant was who he said he

22   was and watched his removal through the Nogales port of entry

23   afoot on December 18th, 2009.

24        Fifth, the Court heard from Customs and Border

25   Protection Fingerprint Specialist Starr Douglas, who compared

1    the fingerprints located on Exhibit 1, 2, 3, and 4 and

2    determined those prints to be from the same individual,

3    Mr. Gutierrez-Barba.  And the Court has Ms. Douglas's report at

4    Exhibit 5.

5            Finally, the Court heard from ICE Deportation Officer

6    James Joyner, the case agent, who testified that defendant

7    received multiple warnings for the consequences of reentry and

8    possible future prosecution should he ignore those warnings and

9    specifically when he was most recently removed on May 24th,

10   2015.

11           Exhibit 12 is a copy of the Form I-294, the Warning to

12   Alien Ordered Removed or Deported.  And Exhibit 13 is the Form

13   I-205, Warrant for Removal, Deportation, and Departure

14   Verification.

15           Officer Joyner also testified that the defendant

16   entered the United States without official restraint.

17   Immigration officials were not aware of his reentry and

18   presence until he was found on September 27th, 2019.

19           Finally, Officer Joyner testified that the defendant

20   never applied for admission or received permission from the

21   U.S. Government to be in the United States between when he was

22   removed and the day he was found by U.S. immigration officials

23   on September 27th, 2019.

24           In sum, Your Honor, there is no doubt in this case

25   that the defendant was removed from the United States.  He

1    thereafter voluntarily reentered.  After entering, he knew he

2    was in the United States, and he voluntarily remained.

3         He was found in the United States without having

4    obtained the consent of the United States Government.  He was

5    an alien at the time of his entry.  And he was free from

6    official restraint.

7         And based on the witness's testimony and the evidence,

8    Your Honor, the defendant is guilty of violating 8

9    United States Code Section 1326.  Thank you.

10        THE COURT:  Thank you.  Ms. Johnson.

11        MS. JOHNSON:  I have no argument.

12        THE COURT:  All right.  The Court will take the matter

13   under advisement.  I will recess for the noon lunch hour.

14   We're a bit ahead of schedule.

15        But what I will do is ask the parties to reconvene.  I

16   would say let's reconvene at 1:30.  And, Mr. Gutierrez-Barba,

17   please join us at 1:30, be present.  And with that, we stand in

18   recess.

19      (Proceedings recessed from 11:22 a.m. until 1:30 p.m.)

20        THE COURT:  The record will reflect the presence of

21   counsel, the presence of Mr. Gutierrez-Barba.

22        The government has charged by superseding indictment

23   Mr. Martin Gutierrez-Barba with reentry of a removed alien, in

24   violation of Title 8 United States Code Section 1326(a).  And

25   the superseding indictment alleges that on or about September

1    27th of 2019, at or near Phoenix, Arizona, in the District of

2    Arizona, Martin Gutierrez-Barba, an alien, was found in the

3    United States of America after having been previously denied

4    admission, excluded, deported, and removed from the

5    United States at or near Nogales, Arizona, on or about December

6    18th of 2009 and not having obtained the express consent of the

7    Attorney General or the Secretary of Homeland Security to

8    reapply for admission, in violation of Title 8 United States

9    Code Section 1326(a).

10            Now, a bench trial did take place this morning, and

11   the Court, having reviewed the testimony and the admitted

12   exhibits, makes the following finding:

13            Martin Gutierrez-Barba was found in the United States

14   by the Phoenix Police Department on September the 27th of 2019.

15   Phoenix Police Officer Justin Kraft encountered him while

16   working with the Maryvale enforcement team.  He ran

17   Mr. Gutierrez-Barba through a scan print identification system

18   to obtain his personal identification, and he confirmed his

19   identity as a non-citizen.

20            And as in the usual course of his duties, he then

21   handed Mr. Gutierrez-Barba off from the 4th Avenue jail, where

22   he had been held, to Immigration and Customs Enforcement.

23            Officer Ryan Moulton, with the Immigration Customs

24   Enforcement, processed Martin Gutierrez-Barba by obtaining his

25   fingerprints and photograph and running his name and

1   fingerprints through a number of databases.

2           He also asked him his country of origin and whether he

3   was born in the United States or if he had any family in the

4   United States.

5           During that process, Mr. Gutierrez-Barba acknowledged

6   being a citizen of Mexico and that his parents were also from

7   Mexico and being without legal status.

8           And indeed Officer Moulton identified him as a Mexican

9   citizen without legal status in the United States.

10          Officer Moulton completed a Form I-213, which is

11  Exhibit 3, and also Exhibit 4.

12          Now, Officer I think it's Arguelles testified that he

13  too was in 2009 a Customs and Border patrol officer who

14  verified Martin Gutierrez-Barba's physical presence and

15  physical removal from the United States on December 18th of

16  2009.  He did so by obtaining the Notice to Alien Ordered

17  Removal -- excuse me -- the Notice to Alien Ordered

18  Removed/Departure Verification Form I-296.

19          He then physically escorted Mr. Gutierrez-Barba along

20  with others to the DeConcini U.S. Port of Entry at Nogales,

21  Arizona.

22          There Mr. Gutierrez-Barba identified himself to

23  Officer Arguelles as one in the same, and Officer Arguelles

24  identified him to do so as well to the officials on the Mexico

25  side of the border.

*REDACTED PURSUANT TO DOC. 160

1            Officer Arguelles opened the port of entry gate and

2    watched Mr. Gutierrez-Barba cross into Mexico on foot as noted

3    in the form at Exhibit 1.

4            Now, the Court notes that Exhibit 1 as well references

5    the date October 7th of 2009.  And Officer Navarro, as he did

6    in a previous hearing in this case, he testified that he was

7    temporarily detain -- excuse me -- temporarily detailed to the

8    Nogales port of entry from September of 2009 through December,

9    2009, working in the passport control unit.

10           And he testified that on October 7th of 2009, he

11   encountered Martin Gutierrez-Barba and obtained his

12   fingerprints, and that is in Exhibit 2.

13           He also interviewed him using a Form I-867A, which is

14   a record of sworn statement.  And in that form Martin

15   Gutierrez-Barba made the following statements.  He stated he

16   was born in -- I will try to pronounce this appropriately --

17   Uruapan, Michoacan, Mexico, that his date of birth is ***** the

18   **** of 1987, that he is a citizen of Mexico, that he claimed

19   no citizenship to the United States, that his parents are

20   citizens of Mexico, that he was not legally immigrated nor has

21   he been paroled into the United States.

22           Now, Officer Arguelles testified that the removal

23   order that he acted upon in taking Mr. Gutierrez-Barba to the

24   port of entry at Nogales was the reinstatement of a prior order

25   of removal initiated by Officer Navarro at Exhibit 1.

UNITED STATES DISTRICT COURT

1          Now, the testimony also reflects that nothing in the

2    A-file or the Department of Homeland Security records show that

3    Martin Gutierrez-Barba applied for permission or consent to

4    enter the United States prior to being found here in September

5    of 2019.

6          And there is no evidence that he was under official

7    restraint during the time he was most recently removed, which

8    was noted in Exhibit 13 as being in May of 2015, through the

9    time that he was discovered in the United States, that is,

10   September the 27th of 2019.

11         There's -- In other words, from the testimony it

12   appears that there was no record of him being encountered by

13   Immigration Customs Enforcement or anyone in the Department of

14   Homeland Security between those dates.

15         Finally, in several exhibits it appears that during

16   the removal process, including back in May, 2015, most

17   recently, Mr. Gutierrez-Barba was informed that he would be

18   prohibited from entering, attempting to enter, or being in the

19   United States for a period of 20 years from the date of

20   departure because he was found to have reentered the

21   United States illegally and to have had the prior order

22   reinstated.

23         Finally, the defendant, Mr. Martin Gutierrez-Barba, is

24   the same person who was apprehended and fingerprinted back on

25   October 7th in 2009 and September 28th of 2009 -- excuse me --

1    2019, as recorded in the A-file and as stipulated to by the

2    parties and as testified to by fingerprint analyst Starr

3    Douglas.

4           And I also note that at the outset of the trial,

5    Ms. Johnson on behalf of her client stated that she did agree

6    and would not contest that he is a Mexican citizen.

7           Now, accordingly, I do find beyond a reasonable doubt

8    that Mr. Gutierrez-Barba is guilty as charged in the

9    superseding indictment.

10          And so having so found, the Court will set the date

11   and time of sentencing on --

12          THE CLERK:  August 10th at 1:15.

13          THE COURT:  Now, I have received and I have reviewed a

14   release status report from pretrial services indicating that

15   Mr. Gutierrez-Barba has been at all times compliant with his

16   release conditions.  But, as the parties know, he is now

17   convicted of this felony offense and does face a length of

18   custody.

19          What is the government's position?

20          MS. MARSH:  The government would ask the Court to take

21   the defendant into custody at this time.

22          THE COURT:  Ms. Johnson.

23          MS. JOHNSON:  Yes, Your Honor.  The relevant statutory

24   provision is 18 U.S.C. 3143, which governs the release or

25   detention of a defendant pending sentence.  And it notes that

1    custody is not -- It says, "The judicial officer shall order

2    that a person who has been found guilty of an offense and who

3    is awaiting imposition or execution of a sentence other than a

4    person for whom the applicable guideline does not recommend a

5    term of imprisonment be detained."

6            So the government last week put on the record its

7    guidelines calculations for Mr. Gutierrez-Barba, which were 6

8    to 12 months.  That is a Zone B, which is not a zone for which

9    custody is recommended.  It is permitted under Zone B, but it

10   is not recommended.

11           So we do not believe that 3143 authorizes the Court to

12   take him into custody merely by virtue of a finding of guilt.

13           However, even moving on from that, even if a term of

14   custody were recommended by the guidelines, which we do not

15   believe that it is, the defendant still has an opportunity to

16   show that he is not a flight risk or a danger to the community

17   by clear and convincing evidence.

18           And we believe that he has easily met that burden.  He

19   has no criminal convictions for anything other than immigration

20   offenses, no encounters with law enforcement for non-regulatory

21   offenses.  He's clearly not a danger to the community.  He has

22   shown up.  He is on an ankle monitor.  And he's not a flight

23   risk.  He doesn't have anywhere to go, which is how we ended up

24   here in the first place.  He has sole custody of his older son.

25   He has a one-and-a-half-year-old child who he financially

1    supports.  He has a house.  He has a job.

2         We believe that he easily meets by clear and

3    convincing evidence the standard of not being a flight risk.

4    He has two of his family members are here today, I believe his

5    third-party custodian and a sister, supporting him.  His whole

6    family's in the area.  He has nowhere else to go.

7         So we do not believe that custody is authorized, given

8    that no custodial sentence is recommended for this offense.

9    But we believe, in the alternative, that he has met the burden

10   of showing by clear and convincing evidence that he's not a

11   flight risk or a danger to the community.

12         THE COURT:  Ms. Marsh.

13         MS. MARSH:  Yes, Your Honor.  Defense counsel may just

14   be misremembering the record we made regarding the defendant's

15   guideline range.  But our calculations are in fact that his

16   guideline range is 10 to 16 months post-conviction at trial.

17   And that is what we put on the record at our prior hearing last

18   Thursday.  That's significantly different than 6 to 12.

19         But, regardless, he's facing a custodial sentence

20   because he served less than two months.  So the guideline range

21   is truly 10 to 16.  But even under the guideline range defense

22   counsel offers, he's still facing additional custody time under

23   the guidelines.  So for that argument I believe the defense --

24   defense is mistaken.

25         Additionally, I think it relevant for the Court to

1    know, though it was not offered in evidence at trial as to not

2    prejudice the defendant, he was arrested by Gilbert Police on

3    September 27th of 2019 when he came in -- ultimately came into

4    federal custody for what is noted as a domestic violence verbal

5    dispute before he was transferred to Phoenix PD.

6            This information was provided to defense counsel as

7    Bates stamp number 127, so they were aware of this.

8    Additionally, then he was transferred from Gilbert PD custody

9    into Phoenix PD custody where he had an outstanding warrant in

10   Phoenix for failure to pay fines or something of the such.

11   There was an outstanding Phoenix warrant that Officer Kraft was

12   executing.

13           So I believe it's inaccurate to portray him to the

14   Court as someone who has not had additional contact with law

15   enforcement when he has in fact had such contact.

16           Also, looking at his prior criminal history -- I'm

17   sorry.  One moment.  Also, looking at his criminal history, he

18   has four prior 1325 convictions, Your Honor, and one conviction

19   for false documents that was the subject of the -- I mean, the

20   Court heard a lot about that in the 1326(d) motion.  So he is

21   not without a criminal history or a serious and longstanding

22   history of defying the Court's orders or defying the law that

23   precludes him from reentering the United States and failing

24   to -- and failing to follow those laws.

25           So I think that when defense counsel is referring back

1    to Section 3143, we're not in a zone that wouldn't require

2    imprisonment.  We are differently situated in a 10- to 16-month

3    range.  And his most recent 1325 sentence was 180 days.  He has

4    previously served, I believe, two 180-day sentences for 1325

5    convictions.

6            So given that history and the fact that he's now been

7    convicted of a felony, it's the government's position that he

8    does pose a flight risk, regardless of his supportive family

9    members in the United States.  And we do seek custody at this

10   time.

11           THE COURT:  Well --

12           MS. JOHNSON:  Your Honor, may I be heard as to the

13   issue of the guidelines because --

14           THE COURT:  Yes.

15           MS. JOHNSON:  -- it's relevant.  Thank you.

16           My understanding is that what the government placed on

17   the record and which was consistent with my understanding is

18   that this is a base offense level of eight offense.  He would

19   receive a two-level upward adjustment because he has two or

20   more prior convictions for illegal entry, which would bring him

21   to an offense level of 10.  I believe that he is in criminal

22   history category III.  That means that if he proceeds to trial

23   and is found guilty and does not accept responsibility, that

24   his guidelines are 10 to 16 months.  But as the Court is aware,

25   because the Court heard the trial this morning,

1    Mr. Gutierrez-Barba did not proceed to trial for the purpose of

2    contesting guilt.  He proceeded for the purpose of preserving a

3    legal offense.  And we offered to stipulate to the evidence

4    that would establish that he was guilty in order to preserve

5    his legal right to appeal, which means that he remains entitled

6    to that two-level downward departure for acceptance of

7    responsibility.

8            And the guidelines are very clear on this fact.  He

9    cannot be punished for preserving a legal right.  He can only

10   be punished for contesting factual guilt, which is not

11   something that he did.

12           So with a two-level downward departure for

13   acceptance or -- excuse me -- downward adjustment for

14   acceptance of responsibility, we are back down at a level

15   eight, which is 6 to 12 months and in Zone B.

16           We also disagree with the government's

17   characterization about the circumstances under which

18   Mr. Gutierrez came into custody.

19           It's my understanding, based on the report that the

20   government provided to us and also conversations with

21   Mr. Gutierrez, that the police came to his house.  There may

22   have been some sort of a call about a domestic disturbance.

23   But when the police came to his house, he was arrested only for

24   this unpaid outstanding ticket.  They discovered he had a

25   warrant because there was some sort of unpaid parking/traffic

1    ticket, something of that nature, and that's the reason he was

2    taken into custody.  I did not understand from the documents

3    provided by the government or from my conversation with

4    Mr. Gutierrez that he was arrested for domestic anything.

5             I think he was determined to be in the country

6    illegally and had a warrant for unpaid fees related to some

7    sort of a traffic offense.

8             So we believe that he is in Zone B, for which a

9    custodial sentence is not recommended, and that under 3143, he

10   should not be taken into custody.  He has showed up for

11   everything.  He's not a danger to the community or a flight

12   risk.

13            MS. MARSH:  Your Honor, may I be heard to clarify the

14   one more thing?  I apologize for the back-and-forth.

15            The government's calculation is based on criminal

16   history category IV, which would include his prior conviction

17   for fraud in 2009, which understandably is older than ten years

18   old at the time he testifies at trial, so we didn't seek to

19   admit that under 609 or any other theory, but was -- is within

20   the guideline criminal history category calculation based on

21   his found-in date, so that would be plus a two-point offense;

22            Then a 1325 in 2014 where he served 105 days, which

23   would also be a two-point offense;

24            Then a 1325 in 2014 where he served 180 days, also a

25   two-point offense; and

1          Then a subsequent 1325 in 2015 for which he also

2     served 180 days, which would be an additional two points.

3          So based on that, his criminal history category is IV,

4     which would place him, even with the acceptance of

5     responsibility reduction, in the range of 10 to 16.  That's the

6     calculation that I gave on Thursday.

7          THE COURT:  Well, I don't have the benefit of the

8     precise sentencing guideline calculation in front of me, but

9     it's more probable, given his criminal -- prior criminal

10    history and in particular this 2009 fraud offense -- and again

11    I don't have the clarity of his record before me -- it is

12    likely that he is facing a term of custody under the meaning of

13    3143.

14         That said, I am concerned because he is now convicted

15    of his felony 1326(a).  As well I note that even though

16    Mr. Gutierrez-Barba, to his credit, he has shown up for all of

17    his proceedings throughout the course of his case, he appears

18    to be self-employed, and he is living with -- I think he's got

19    a third-party custodian who is his brother.

20         And so at this time the Court does find an order of

21    detention is necessary here.

22         Ms. Johnson, if you wish to reopen and make a finding

23    or try to make a showing of clear and convincing evidence that

24    he should be released pending the outcome of his sentence, you

25    can.  And certainly if you do decide to do so, I'd ask for a

1    more complete calculation of the sentencing guidelines.

2              I have not looked at it.  I've not looked at the prior

3    reports other than the status report from his pretrial services

4    officer, which says that he has been at all times compliant.

5              So at this point I am going to have to ask that he be

6    taken into custody.  And you can determine whether or not you

7    wish to move to reopen for a hearing if you think that you wish

8    to do so.

9              And so, Mr. Gutierrez-Barba, now that you have been

10   convicted of this reentry of a removed alien felony violation,

11   I'm sure Ms. Johnson has explained to you that there's a

12   potential that you would be taken into custody today.  And so

13   there are two United States marshals who are present in the

14   courtroom who will take you into custody.  They will process

15   you in.  And you can have a conversation about steps going

16   forward and listen to your counsel about that.

17             And so at this juncture, is there anything further

18   from the government?

19             MS. MARSH:  No, thank you, Your Honor.

20             THE COURT:  Ms. Johnson?

21             MS. JOHNSON:  No, Your Honor.

22             THE COURT:  There being nothing further, then this

23   matter's adjourned.

24        (Proceedings recessed at 1:56 p.m.)

25

C E R T I F I C A T E

1

2

3          I, LINDA SCHROEDER, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7   a full, true, and accurate transcript of all of that portion of

8   the proceedings contained herein, had in the above-entitled

9   cause on the date specified therein, and that said transcript

10  was prepared under my direction and control and incorporates

11  redactions requested pursuant to Federal Rule of Criminal

12  Procedure 49.1.  Redacted characters appear as "*" in the

13  transcript.

14          DATED at Phoenix, Arizona, this 28th day of October,

15  2021.

16

17

18                                  s/Linda Schroeder
                               Linda Schroeder, RDR, CRR
19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT